| | |
|---|---|
| 1 | Rhidian Orr, Esq., CBN 33738 |
| 2 | Conor Hagerty, Esq., CBN 42629<br>Nathan Johnson, Esq., CBN 42905 |
| 3 | Rick Hernandez, Esq., CBN 30627<br>**THE ORR LAW FIRM, L.L.C.** |
| 4 | 720 S. Colorado Blvd, Suite # 1110<br>Denver, Colorado 80246 |
| 5 | Telephone: (303) 818-2448<br>Facsimile:  (303) 845-9140 |
| 6 | William A. LeFaiver, Esq., SBN: 0033683 |
| 7 | **WILLIAM A. LeFAIVER, CO., LPA.**<br>8010 McGhee Lane |
| 8 | Hudson, Ohio 44236-1332<br>(330) 425-4501 (Telephone) |
| 9 | Antemo1956@aol.com |
| 10 | |
| 11 | *Attorneys for Plaintiffs and the Putative Class* |

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| BETHANY LANGE, JENNIFER OH, BROOKE HOFFMAN, MICAH BAILEY, LINDA SOLTIS, DERRICK SMITH, SHILOH IRVIN, MATTHEW BRUDNICKI, JAMES ROCHE, JENNIFER JOHNSTON, MICHAEL SPANO, TORIANNA BONDS, DAKOTA JONES, DUSTY DERIGO, DAN MCCULLOUGH, ANGEL GONZALES, CHRISTINA BOHNSTEDT, on behalf of themselves and all others similarly situated;<br><br>                              Plaintiffs,<br><br>vs.<br><br>ALCOHOL MONITORING SYSTEMS, INC., a Delaware Corporation; LOS ANGELES ALCOHOL MONITORING Inc., a California Entity; SCRAM OF CALIFORNIA, Inc., a California Corporation; ETOH MONITORING, L.L.C., a Louisiana Corporation; RECOVERY SOLUTIONS CONSULTING & TRAINING CORP, a New York Corporation; RECOVERY HEALTHCARE CORPORATION, a unknown entity; SENTINEL OFFENDER SERVICES, LLC., a Delaware Corporation; SCRAM SYSTEMS OF ILLINOIS, Inc., an Illinois Entity; HOUSE ARREST SERVICES, Inc., Unknown Entity; ROCKY MOUNTAIN OFFENDER MANAGEMENT SYSTEMS, LLC., a Colorado Corporation;         [continued of page 2] | Case:<br><br>**CLASS ACTION CIVIL RIGHTS COMPLAINT FOR CONSTITUTIONAL CIVIL RIGHTS AND INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

-1-
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

**1** PRONTOTRAK, Inc., a Georgia Corporation; )
TOTAL COURT SERVICES OF INDIANA, )
**2** L.L.C., an Indiana Corporation; COURT )
PROGRAMS, Inc., a Mississippi Corporation; )
**3** MIDWEST MONITORING AND )
SURVEILLANCE, INC., a Minnesota )
**4** Corporation; and DOES 1-10, inclusive. )
)
**5**              Defendants. )
)
**6** _____ )

**7** **I.     INTRODUCTION AND GENERAL ALLEGATIONS**

**8**           Plaintiffs, Bethany Lange Jennifer Oh, Brooke Hoffman, Micah Bailey,

**9** Linda Soltis, Derrick Smith, Shiloh Irvin, Matthew Brudnicki, James Roche, Jr.,

**10** Jennifer Johnston, Mike Spano, Torianna Bonds, Dakota Jones, Dan McCullough,

**11** Dusty Derigo, Angel Gonzales, and Christina Bohnstedt (hereinafter collectively

**12** "Class Plaintiffs") does bring this class action complaint against the Defendants,

**13** and each of them, for the intentional, reckless, and complete disregard of the Class

**14** Plaintiffs', and the Classes' well established rights that are guaranteed by the

**15** federal Constitution of the United States of America.

**16**           On behalf of themselves, others similarly situated and the proposed classes

**17** of the Defendants' customers, Plaintiffs seek damages, restitution and injunctive

**18** relief against Defendants for the false advertising of their transdermal monitoring

**19** service. For their class action complaint, Plaintiffs allege as follows upon personal

**20** knowledge as to themselves and their own acts and experiences, and as to all other

**21** matters, upon information and belief, including investigations conducted by their

**22** attorneys.

**23**           Plaintiffs, and the classes they seek to represent, bring this action against the

**24** Defendants to protest a grave injustice to stop corporate intrusion upon the United

**25** States Constitution, to ensure that the rights of the People shall not be abridged.

**26** Plaintiffs, and the Class, challenge and seek to enforce and enjoin the Defendants,

**27** and each of them, to adhere to the standards for which the Constitution is clearly

**28**

1    defined for, and as, that applies to all citizens of the territory thereof.

2    The SCRAM Device has become an increasingly utilized alcohol testing

3    device in the criminal justice and addiction treatment industries throughout the

4    United States. Defendants marketed and sold, and continue to market and sell, their

5    SCRAM Devices to various drug and alcohol monitoring companies in these

6    industries. The alcohol monitoring companies provide monitoring services to any

7    person, charged with a DUI criminal offense, oftentimes renting out the SCRAM

8    Devices and acting as third-party supervisors of the users' test results.

9    In marketing and selling their SCRAM Devices to other alcohol monitoring

10   companies and consumers, Defendants portrayed, and continue to portray, their

11   SCRAM Devices as being admissible and certified by the courts.

12   In spite of these representations, the SCRAM Device frequently return error

13   messages, false positives, false tampers, and even false removals from the

14   customers' leg, and the Defendants actively conceal these malfunctions from the

15   courts and the public, at large.

16   Once a person is suspected of a consumption of alcohol, a report is then

17   generated, and sent to the corporate offices of the alcohol monitoring companies

18   who are the Defendants herein, who then in turn, (as Defendant AMS does), have a

19   minimum wage school student, with inadequate training and no formal education

20   in this field, read the alleged report and is then given instructions from the AMS

21   corporate figures to render an opinion that the wearer consumed alcohol, tampered

22   with the SCRAM Device, or did both. Defendant AMS does not send any of their

23   employees for any training or certification for a primary reason. Because there

24   does not exist any form of training, certification, or courses that teaches a person to

25   read a graph to makes a determination if the wearer consumed alcohol, came into

26   contact with products on the market that contain alcohol, or used hair spray.

27   Defendant AMS then transmits their report to the co-Defendant SCRAM who then

28   in turn reads the report. And once reviewed in the Defendants corporate office in

-3-

Los Angeles, the report is then sent to the third-party alcohol monitoring provider, who receives the SCRAM report and then sends that same report to the Court, the Prosecutor, and finally, to the Defense Attorney. This process of transmitting and sending the report from party to party, creates delays in turning over exculpatory evidence, and the general overall turnaround time is often a month or two, making it impossible for the DUI Defendant to then take an independent DUI test, that is admissible in Court and which refutes the SCRAM report.

As a result of Defendants' conduct, the SCRAM wearer is not notified in real time that the wearer allegedly violated the terms of their DUI criminal case, their probation and bond conditions. Once the SCRAM client is notified about the alleged violations, weeks, if not months have gone by depriving the SCRAM client the right to have a blood test done which by all accounts produces results that cannot be manipulated. After so many hours, alcohol leaves a person's blood stream and cannot be determined whether or not the person, like the SCRAM clients have consumed alcohol, on the day in question.  Plaintiffs, on behalf of themselves and on behalf of a Class of similarly situated individuals, bring this lawsuit seeking injunctive relief, actual damages, and restitution, together with costs and reasonable attorneys' fees.

## II.    JURISDICTION AND VENUE

1.    Plaintiffs present federal claims for relief under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1343.

2.    This Court also has federal question subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, as the action arises under 42 U.S.C. § 1983, 1985, and 1988(c). Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202;

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

3.     Plaintiffs' claims arise out of acts and omissions of the Defendants, and each of them, in this District.  Accordingly, venue is proper within the District of Colorado because the Defendants are subject to personal jurisdiction in this District, as Defendants Scram of California, Inc., ("SCRAM") and Alcohol Monitoring Systems, Inc., ("AMS") have their headquarters located in this District, and, each of the Defendants transact business in this District. All AMS reports, emanates from this District, then transmitted to third party providers around the country.  The said Defendants' alleged misconduct arises from this District, and a substantial part of the events in this action occurred in this District. Defendant AMS also transmits the delayed reports from their central offices located in the District of Colorado. Further, Defendant AMS advertises of their website for each of the Defendants that was created in Littleton, Colorado. And all money paid by each of the Defendants is sent to AMS that is headquartered within this District.

III.     **PERSONAL AND SUBJECT MATTER JURISDICTIONS**

4.     This Court also can assert personal jurisdiction over each of the Defendants pursuant to the relevant states' long-arm statutes under one or more of the theories below:

a.     Each Defendant has purposefully availed itself of the privilege of conducting business activities within the relevant states and has the requisite minimum contacts with each of those states because each Defendant participated in a conspiracy which injured SCRAM clients in the relevant states and overt acts in furtherance of the conspiracy were committed within the relevant states; and/or

b.     Each Defendant has purposefully availed itself of the privilege of conducting business activities within the relevant states and has the requisite minimum contacts with those states because each Defendant committed intentional acts that were intended to cause and did cause injury within the relevant states; and/or

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

1    c.    Each Defendant has purposefully availed itself of the privilege of

2 conducting business activities within the relevant states and has the requisite

3 minimum contacts with those states because each defendant committed intentional

4 acts that defendants knew were likely to cause injury within the relevant states;

5 and/or

6    d.    Each Defendant has purposefully availed itself of the privilege of

7 conducting business activities within the relevant states and has the requisite

8 minimum contacts with those states because each Defendant is a party to an

9 anticompetitive agreement with a resident of the relevant state, which agreement is

10 performed in whole or in part within the relevant state; and/or

11    e.    Each Defendant has purposefully availed itself of the privilege of

12 conducting business activities within the relevant states and has the requisite

13 minimum contacts with those states because each defendant has committed a civil

14 rights violation within the relevant state, which has caused injury within the state;

15 and/or

16    f.    Each Defendant has purposefully availed itself of the privilege of

17 conducting business activities within the relevant states and has the requisite

18 minimum contacts with those states because each Defendant either has clients

19 within the relevant state or transacts business within the relevant state; and/or

20    g.    Each Defendant has purposefully availed itself of the privilege of

21 conducting business activities within the relevant states and has the requisite

22 minimum contacts with those states because each Defendant either has clients

23 within the relevant state or transacts business within the relevant state; and/or

24    h.    Each Defendant has purposefully availed itself of the privilege of

25 conducting business activities within the relevant states and has the requisite

26 minimum contacts with those states because each Defendant has entered into a

27 private written contract with Defendant Alcohol Monitoring Systems, Inc., and in

28 the contract, each Defendant agreed to litigation to be litigated in this District.

i.     Each Defendant has purposefully availed itself of the privilege of conducting business activities within the relevant states and has the requisite minimum contacts with those states because each Defendant has entered into a private written contract with Defendant Alcohol Monitoring Systems, Inc., and in the contract, each Defendant agreed to transmit funds as a part of the contract amongst each of the Defendants.

j.     Each Defendant has purposefully, and amongst themselves, created, augmented, and agreed to enter into a conspiracy to violate the constitutional and civil rights of each of the Plaintiffs, and members of the class in this District.

## IV.     PARTIES

5.     Plaintiff Bethany Lange is a citizen of the State of New York.

6.     Plaintiff Jennifer Oh a citizen of the State of California.

7.     Plaintiff Brooke Hoffman is citizen of the State of South Dakota.

8.     Plaintiff Micah Bailey is a citizen of the State of Louisiana.

9.     Plaintiff Linda Soltis is a citizen of the State of Ohio.

10.     Plaintiff Derrick Smith is a citizen of the State of Texas.

11.     Plaintiff Shiloh Irvin is a citizen of the State of Georgia.

12.     Plaintiff Matthew Brudnicki is a citizen of the State of Illinois.

13.     Plaintiff James Roche is a citizen of the State of Florida.

14.     Plaintiff Jennifer Johnston is a citizen of the State of Missouri.

15.     Plaintiff Michael Spano is a citizen of the State of New York.

16.     Plaintiff Toriahna Bonds is a citizen of the State of Michigan.

17.     Plaintiff Dakota Jones is a citizen of the State of California.

18.     Plaintiff Dan McCullough is a citizen of the State of Georgia.

19.     Plaintiff Dusty Derigo is a citizen of the State of Indiana.

20.     Plaintiff Angel Gonzales is a citizen of the State of California.

21.     Plaintiff Christina Bohnstedt is a citizen State of Minnesota.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22.     Class Plaintiffs, Plaintiffs, Plaintiffs, Bethany Lange Jennifer Oh, Brooke Hoffman, Micah Bailey, Linda Soltis, Derrick Smith, Shiloh Irvin, Matthew Brudnicki, James Roche, Jr., Jennifer Johnston, Mike Spano, Torianna Bonds, Dakota Jones, Dan McCullough, Dusty Derigo, Angel Gonzales, and Christina Bohnstedt by and through their undersigned counsels, hereby file this Class Action Complaint, individually, and on behalf of all others who are similarly situated—and make these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery—against the Defendants, and each of them.

23.     Defendant, Alcohol Monitoring Systems, Inc., ("AMS") is a Delaware corporation with its national headquarters located in Littleton Colorado. Defendant AMS is a nationwide provider of alcohol monitoring devices and services to state and federal law enforcement agencies. Defendant AMS is registered in California and provides alcohol monitoring services in California, including in this District, and elsewhere throughout the United States. Additionally, AMS is a corporation existing under the laws of the State of Delaware. AMS has a principal place of business located at 1241 W. Mineral Avenue, # 200, Littleton, Colorado, 80120.

24.     Defendant, Scram of California, Inc. is a California corporation with its national headquarters located in Los Angeles, California. Defendant is a local distributer and provider of AMS's devices and services in this District, and elsewhere throughout California. Defendant SCRAM maintains its principal place of business in California. In addition, SCRAM does transact business in California, maintains a website in California, has numerous contracts with State agencies and their principal place of business is located at 402 West Broadway, # 1250, San Diego, California 92101.

25.     Defendant Recovery Solutions Consulting & Training Corp., ("RSC") is an unknown entity doing business in the State of New York, a provider of alcohol monitoring to individuals throughout the New York area, and their

corporate office is located at 4885 Cliffside Drive West, Clarence, New York, 14031.

26.     Defendant, Los Angeles Alcohol Monitoring, Inc., ("LAAM") is a California Corporation doing business in the State of California and provides alcohol monitoring to individuals throughout the Los Angeles and their corporate office is located at 11500 W. Olympic Blvd, Suite # 400, Los Angeles, CA, 90064.

27.     Defendant, Etoh Monitoring, LLC., ("ETOH") is a limited liability Corporation doing business in the State of Louisiana and provides alcohol monitoring to individuals throughout the New Orleans area, and their corporate offices are located at 424 Gravier Street, 4th Floor, New Orleans, Louisiana, 70130.

28.     Defendant Recovery Healthcare Corporation., ("RHC") is a Texas Corporation doing business in the State of Texas, a provider of alcohol monitoring to individuals throughout the Dallas, Texas area, and their corporate office is located at 9090 N. Stemmons Frwy, Suite # A, Dallas, Texas 75247.

29.     Defendant Sentinel Offenders Services, LLC., ("SENTINEL") is limited liability Corporation doing business in the State of Delaware, with offices in Georgia, and within this District is headquartered in Irvine, California and also provides alcohol monitoring to individuals nationwide. Their agent for service is located at 40 Technology Parkway, Suite # 300, Ben Hill, NORCROSS, Georgia 30092.

30.     Defendant Scram Systems of Illinois, Inc., ("SSI") is a Corporation doing business in the State of Illinois, with offices in Chicago, and within this District, provides alcohol monitoring to individuals nationwide. Their corporate office is located at 208 S. LaSalle Street, Suite # 814, Chicago, Illinois, 60604.

31.     Defendant Court Programs, Inc., ("CPI") is an unknown Mississippi Corporation, and provides alcohol SCRAM monitoring to individuals in various

states. Their corporate office is located at 13091 Oxford Street, Biloxi, Mississippi, 39532.

32.     Defendant Rocky Mountain Offender Management Systems, L.L.C., ("RMOMS") is a limited liability Corporation doing business in the State of New York. Their corporate office is located at 8787 Turnpike Drive, # 20, Westminster, Colorado, 80031.

33.     Defendant House Arrest Services, Inc., ("HAS") is a Corporation doing business in the State of Michigan, provides alcohol monitoring to individuals in the States of Michigan, New York, Georgia, and Florida area. Their corporate office is located at 16039 East Nine Mile Road, Eastpointe, Michigan 48021.

34.     Defendant ProntoTrak, Inc., ("PRONTO") is a Georgia Corporation doing business in the State of Georgia, and provides alcohol monitoring to individuals in various states. Their corporate office is located at 106 Colony Park, Suite # 800, Cumming, Georgia, 30040.

35.     Defendant Total Court Services of Indiana, LLC., ("TCSI") is an Indiana Corporation doing business in the State of Indiana, and provides alcohol monitoring to individuals in various states. Their corporate office is located at 326 S. 9th Street, Suite # 323A, Noblesville, Indiana, 46060.

36.     Defendant Midwest Monitoring and Surveillance, Inc., ("MMS") is an Minneasota Corporation, and provides alcohol SCRAM monitoring to individuals throughout the state. Their corporate office is located at 2500 W. Co Road, # 5, Burnsville, Minnesota, 55337.

37.     Plaintiffs are currently ignorant of the true name(s) and the capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictious names, DOES 1 through 10, inclusive, and therefore, sues such civil Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of said fictitiously named

-10-

1   Doe Defendants, who are legally responsible in some manner for the events and

2   are also sued.

3        38.   Plaintiffs are informed and believe and thereon allege that the

4   Defendants, including the fictitious Doe Defendants, were at all times acting as

5   actual agents, conspirators, ostensible agents, partners, joint ventures and/or the

6   employees of all other Defendants, and that all acts alleged herein occurred within

7   the course and scope of said agency, employment, partnership, joint venture,

8   conspiracy, or enterprise, and with the express and/or implied permission, with all

9   such knowledge, consent, authorization and ratification of their own co-

10  Defendants. However, each of these allegations are deemed "alternative" theories

11  whenever not doing so would result in a contraction with the other allegations.

12       39.   Whenever the Complaint refers to any act of the Defendants, the

13  allegations shall be deemed to mean the act of those Defendants named in the

14  particular cause of action, and each of them, acting individually, jointly and

15  severally.

16  **V.   COMMON ALLEGATIONS OF FACT**

17       40.   Defendants are providers of alcohol monitoring services and devices

18  to state and federal law enforcement agencies, courts, as well as various private

19  entities.

20       41.   The alcohol monitoring device used by Defendants is called the

21  SCRAM Continuous Alcohol Monitoring system (the "SCRAM Device").

22       42.   The SCRAM Device is approximately the size of a deck of cards and

23  is placed on the wearer's ankle using a strap. The Scram Device is a transdermal

24  monitoring device that was designed to detect and record any instances when the

25  wearer had consumed alcohol by detecting alcohol vapors caused by ingested

26  alcohol diffusing through the skin.

27       43.   Although most of Defendants' business consists of providing alcohol

28  monitoring services to individuals as part of court mandated rehabilitation

1  programs, as a condition of probation or bond, or other purposes related to the

2  criminal justice system, they are also private vendors of their services.

3      44.    While Defendants are selected by state and federal agencies and

4  courts to provide monitoring services for defendants charged with a crime and

5  other individuals who become involved in the criminal justice system, it is such

6  individuals who are ultimately Defendants' customers and choose to purchase

7  Defendants' alcohol monitoring service as an alternative form of monitoring

8  offered by the state or federal agency or court.

9      45.    Defendants, acting under the color of authority, enter into private

10  contracts with each such individual to provide them their alcohol monitoring

11  services, and directly charge them a monthly fee for this service.

12      46.    Defendants advertise their SCRAM Device as a cost-effective and

13  accurate alternative for law enforcement agencies and courts to track the alcohol

14  usage of at-risk individuals such as those charged with driving under the influence

15  or other crimes relating to consumption of alcohol.

16      47.    Specifically, the SCRAM Device is meant to be worn 24/7. The

17  wearer is instructed to once-a-day connect the SCRAM Device to a special

18  docking station connected to the internet to upload the monitoring data collected

19  by the device throughout the day. Once the device is connected, the data is sent to

20  a central data center in Colorado operated by AMS. There, the data is reviewed to

21  determine if any monitoring "event" occurred that indicates that the wearer

22  ingested alcohol.

23      48.    Unlike blood alcohol monitoring that directly detects the level of

24  alcohol present in the blood stream, Defendants' SCRAM Device relies on

25  transdermal alcohol monitoring, which operates by detecting the amount of alcohol

26  that evaporates through the skin. Because the rate at which alcohol evaporates

27  through the skin is significantly different than the rate at which alcohol is

28  metabolized and detected in the blood stream, transdermal alcohol monitoring

-12-

1   requires the use of an algorithm to approximate the blood alcohol content of the

2   wearer based on the amount of alcohol vapor detected at the skin surface.

3       49.    Because transdermal alcohol monitoring measures the amount of

4   alcohol evaporating through the wearers' skin, the SCRAM Device is by its design

5   susceptible to detecting "false-positive" alcohol readings as a result of what

6   Defendants term to be "environmental alcohol." That is, alcohol vapors that

7   wearer's encounter on an everyday basis that may come in contact with the

8   SCRAM Device.

9       50.    Environmental alcohol takes many forms, and many everyday

10   products contain alcohol that evaporates upon exposure to air and can trigger a

11   SCRAM Device to detect alcohol vapors. For example, body spray, cologne,

12   aftershave, hand sanitizer; household cleaners such as Windex, gasoline, and many

13   other products that most individuals come across on a day-to-day basis contain

14   alcohol that evaporates into the atmosphere.

15       51.    Given the placement of the SCRAM Device against the wearer's skin,

16   on their ankle, and the fact that the SCRAM Device is designed to detect the

17   presence of alcohol in the air surrounding the wearer, any environmental alcohol

18   present near or around the device will lead to the device detecting the presence of

19   alcohol vapors even if the wearer had not ingested any alcohol themselves.

20       52.    Defendants advertise to the public and the governmental agencies

21   with whom they seek to work with, that the SCRAM Device is capable of

22   determining the difference between alcohol vapors that are detected as a result of

23   "ingested alcohol" and alcohol vapors that are detected as a result of

24   "environmental alcohol."

25       53.    Further, the individuals who ultimately purchase Defendants' alcohol

26   monitoring services, are not in any way informed that the SCRAM Device could

27   even register any false-positive test results due to environmental alcohol before

28   making the decision to purchase Defendants' alcohol monitoring service and

1    submit to monitoring via the SCRAM Device.

2

3        54.    However, Defendants misrepresent the risk of false-positive test

4    results as a result of environmental alcohol. In fact, numerous sources have

5    documented instances of false-positive test results recorded by the SCRAM Device

6    when the wearer was proven to have not consumed any alcohol.

7        55.    For example, in one instance a criminal defendant in Oakland County

8    Michigan was fitted with the SCRAM Device as a condition of being released on

9    bond following a car accident. Subsequently, the court was notified of three

10   drinking episodes that were potential violations of the conditions of the bond, and a

11   bond revocation hearing was held. However, at the hearing, the Honorable Dennis

12   Powers of the Novi District Court determined that the SCRAM Device was in fact

13   unreliable and that the events detected were false-positives. Specifically, according

14   to the data recorded by the SCRAM Device, during the first drinking episode the

15   wearer consumed alcohol for 63 consecutive hours and maintained an identical

16   blood-alcohol level at all times—a biological impossibility. The second drinking

17   episode was detected by the SCRAM Device at the exact same time as when the

18   wearer was taking a breath-alcohol test that showed no presence of alcohol

19   whatsoever. The third drinking episode was detected when the wearer was in the

20   hospital, and even though the wearer had not consumed any alcohol whatsoever,

21   the data recorded was identical to data corresponding to some who had internally

22   ingested alcohol. The court rejected the evidence presented by AMS and in

23   particular noted that "the SCRAM tether did not meet the requisite standards of

24   'reliability' or 'general acceptance' in the relevant scientific community" and that

25   "[t]he body of evidence supplied by the defendant made it clear that the readings

26   by the SCRAM tether were not necessarily the result of prolonged drinking

27   episodes."

28

1

2       56.     As another example, another DUI defendant was ordered by the Court

3   in Ramsey County Minnesota to wear the SCRAM ankle bracelet as a result of a

4   DUI related offense. The SCRAM device is worn as an ankle bracelet which

5   monitors the migration of alcohol through the offender's skin. The measurements

6   are then obtained are converted to a blood-alcohol content which is designated as

7   the TAC, which means Transdermal Alcohol Content.

8       57.     In this case, on November 9, 2006, the defendant's SCRAM device

9   showed a positive reading for alcohol with a confirmed peak reading .035 TAC.

10  On November 10, 2006, at approximately 6:00 a.m., the defendants SCRAM

11  device showed a positive reading for alcohol with an alleged confirmed peak

12  reading in at .05 TAC. The defendant was notified a week later that he tested

13  positive for alcohol consumption and that a probation violation report would be

14  filed against him. The defendant was notified by their attorney and the defendant

15  got an alcohol test done through a certified medical lab and the results were

16  negative.

17      58.     In the very case, just as the same facts as each of the Plaintiffs, the

18  Honorable Edward S. Wilson found SCRAM highly unreliable and based on the

19  hearing that was held, the trial Court found that SCRAM was not widely accepted

20  in the scientific community. Further, Judge Edward Wilson also determined that

21  the SCRAM device that the defendant was wearing was not in proper working

22  order on the dates in question. As such, the violation was dismissed.

23      59.     In a study of the accuracy of transdermal alcohol monitoring utilizing

24  the SCRAM Device, it was similarly noted that the "methodology used by AMS

25  cannot separate ethanol from other contaminating alcohols and therefore is not a

26  reliable method." This is of particular significance because ingested alcohol is

27  specifically comprised of ethanol. Thus, any device intended to measure an

28  individual's blood alcohol content that is not specific to ethanol will detect all

-15-

1   types of alcohols, including those that are not ingested by an individual. The

2   SCRAM Device utilizes "fuel cell" technology that creates an electric current

3   when an electrolyte contained within the device comes in contact with chemicals

4   that has a "hydroxyl" group. The chemicals include isopropyl alcohol (rubbing

5   alcohol), antifreeze, and many other "alcohols" such as those previously described

6   above. Because the SCRAM device is not specific to detecting ethanol, any

7   number of other alcohols that are not ingested by the wearer can result in the

8   Device registering an "alcohol" reading if they come in contact with the device.

9       60.     Because the SCRAM Device does not directly measure the wearers'

10  blood alcohol content, and is not specific to detecting ethanol, a reading by the

11  SCRAM Device detecting the presence of alcohol vapor is not by itself in any way

12  indicative that the wearer had actually consumed alcohol.

13      61.     As discussed above, Defendants have to apply an algorithm to

14  determine whether any readings collected by the SCRAM Device actually

15  correspond to what Defendants term a "confirmed alcohol consumption event."

16      62.     Specifically, Defendants measure the rate at which the alcohol vapor

17  readings detected by the SCRAM Device increase and decrease in order in order to

18  determine whether they match the predicted rate at which alcohol vapors are

19  released as a result of alcohol being metabolized by the human body. In applying

20  their algorithm to determine whether an "alcohol consumption event" occurred,

21  Defendants rely on a general assumption that the rate at which alcohol vapor is

22  released through the skin following the consumption of alcohol falls within a

23  certain range for all individuals, regardless of any distinguishing physiological

24  characteristics (i.e. weight, height, thickness of skin).

25      63.     Applying this algorithm, Defendants claim to be able to distinguish

26  between alcohol vapor readings caused by "alcohol consumption events" and

27  readings caused by "environmental alcohols," because alcohol vapor readings that

28  are caused by environmental alcohols are supposed to have a significantly different

-16-

rate at which they increase/decrease in comparison to readings that are caused by ingestion of alcohol.

64.     Because the raw data produced by the SCRAM Device is by itself of limited use in determining whether the wearer actually consumed alcohol, the data has to be sent to AMS' central monitoring facility in Colorado to be analyzed and for AMS' personnel to apply the algorithm and attempt to determine whether an "alcohol consumption event" had occurred.

65.     When a customer of Defendants' alcohol monitoring service connects their SCRAM Bracelet into the internet connected docking station each day, the data collected for that day is sent to AMS for such analysis.

66.     If upon analyzing the data AMS determines that the alcohol vapor readings were caused by an "alcohol consumption event," Defendants inform the law enforcement agency or court exercising jurisdiction over the wearer that based on their analysis of the collected data the individual had consumed alcohol.

67.     However, the individual who was actually wearing the SCRAM Device, is not in any way informed by Defendants or by the device itself that an "alcohol consumption event" had occurred, neither at the time when the SCRAM Device is actually recording the alcohol vapor readings, nor when AMS concludes its analysis of the data and informs the law enforcement agency or the court.

68.     In fact, the SCRAM Device is not designed to, and does not actively inform the wearer in real-time when it is detecting alcohol vapors. Even if the SCRAM Device records alcohol vapor readings continuously for 24 hours, when the wearer connects the SCRAM Device to the docking station to upload the data, the SCRAM Device will simply flash a green light to inform the wearer that the upload was successful.

69.     Because the vast majority of Defendants' customers purchase the transdermal alcohol monitoring service as part of a condition of their bond or probation, a report to a law enforcement agency or judiciary that an individual has

been determined to have consumed alcohol will often be considered a violation of the conditions of any such bond or probation and trigger a hearing revoking the bond/probation.

70.     Moreover, because Defendants' customers are not timely notified when the SCRAM Device detects the presence of alcohol vapors, when the data is uploaded daily to AMS, or even when AMS sends a report stating that an "alcohol consumption event" has occurred, the customers often do not discover that they had supposedly violated the conditions of their bond or probation until several days after the "alcohol consumption event" had occurred.

71.     Once the SCRAM Device sends notice to AMS at their central facility, it is there, that a minimum wage employee with inadequate training and education in these area, reads the report that is oftentimes accompanied with graphs and indicates various TAC readings, dates, and times of any and all alleged drink or tamper events. Once the report is received by AMS, those reports are then held by AMS for three to four days before it is then turned over the SCRAM for review. Once SCRAM allegedly reviews the reports, it is then SCRAM and AMS quickly turn those violation reports over to the Court and the Prosecutors handling the criminal case of the said Scram customer who is charged with the DUI offense.

72.     It is the pattern and practice of the Defendants, and each of them, to intentionally delay sending the alleged violation reports to the Scram customers, and their criminal Defense Attorneys by days, weeks, and even months. The general purpose of the scam is so that the SCRAM wearer does not have an opportunity to seek out options of having traditional blood tests done to show by the preponderance of the evidence that the wearer is innocent.

73.     Thus, Defendants' customers who wish to dispute any finding that they violated the terms of their bond/probation are unable to obtain evidence that could allow them to challenge the revocation of their bond/probation because by the time they are made aware of the potential violation, due to the rate of alcohol

-18-

1   metabolism in the human body, Defendants' customers cannot obtain a timely

2   blood or breath alcohol test that could definitively show that they did not consume

3   alcohol at the time indicated by the SCRAM Device.

4       74.   In addition, the Defendants, and each of them have unconstitutional

5   practices that are often deployed by them. For example, the Defendants will turn

6   over violation reports the day of the alleged SCRAM violation hearing.

7       75.   As a classic example, Plaintiff Linda Soltis was charged with an

8   alleged SCRAM violation. Once received, the probation department then sent a

9   copy of the report to the prosecutor handing Ms. Soltis' DUI case. This report was

10   turned over to the probation department and prosecutor several weeks later after

11   the said report was generated.

12       76.   On the day of the alleged violation hearing, Ms. Soltis and all the

13   other parties were present and the prosecutor handed Ms. Soltis' attorney a copy of

14   the alleged violation report, 15 minutes before the hearing. Additionally, the

15   prosecutor informed Ms. Soltis' attorney that AMS had sent an employee to the

16   hearing, to testify as to the report.  At no time was Ms. Soltis' attorney able to

17   properly cross-examine the AMS witness because he was just notified of the report

18   and the existence of the witness, 15 minutes prior to the Court calling its calendar.

19       77.   The Plaintiffs in this case, like many other Americans in this Country,

20   enjoy the privileges and immunities of the United States Constitution to petition

21   the Courts, call witnesses on their behalf, the right to cross-examine, and to have a

22   fair hearing, all of which is guaranteed by the United States Constitution.

23       78.   As a long-standing custom and practice with the Defendants, and each

24   of them, they are given enormous power and deference by various City, County,

25   State, and some Federal agencies and Courts.  In some instances, the Defendants

26   are even given the power by the local Sheriff to setup an office right inside the

27   local County Jail. In another instance, the Defendants are required to appear at a

28   local county jail to fit the Scram client with the ankle monitor. Prior to placing the

SCRAM Device on a potential client, the Defendants, and each of them, then charge an exorbitant fee up front, ranging from $150.00 to as much as $400.00. And should the client not have the funds for the set-up fee, the Defendants, and/or each of them, will not send their employee and/or agent to the jail to attach the SCRAM Device until the set-up fee is paid to the Defendant(s). In one instance, a man in Santa Barbara who was arrested for a DUI offense, posted a bail bond to secure his release, but could not leave the jail until a Scram of California, Inc., employee appeared at the jail to have the SCRAM Device attached to him. That man stayed in jail for four (4) days until the Scram employee arrived, thereby denying the man, his right to be free from unlawful seizure guaranteed by the Fourth Amendment to the United States Constitution.

79.     Among the many other Constitutional violations committed by each of the Defendants, is their violation of their customers' due process rights. When a Plaintiff, such as each of the Plaintiffs in this case, are placed on alcohol monitoring with the Defendants, they will then use the opportunity to collect money from the Plaintiffs, and the members of the Class by detaining the Scram customer in their office to then tell the customer they are under arrest for violating the Scram conditions, then the Defendants, and each of them, threaten to send letters to the Trial Court judges informing the Judge presiding over their DUI matter, that the Scram customer is in violation of their conditions of bond, probation, or parole. Then the Defendants will then send letters to their Scram customer that the Defendants, and each of them, are also reporting them to a debt collector and that services will be terminated.

80.     There are at times when a Scram wearer is unable to afford the high-end set-up fee, or the exorbitant monthly fee, and the wearer cannot make the payment that month. What the Defendants, and each of them fail to inform the wearer, is that the Scram customer may seek a financial reduction sheet from the

-20-

1   Defendants that will entitle the Scram customer to pay less based on their income,

2   mortgage, economic expenses, child support, etc.

3        81.    However, when the Plaintiffs, and the Class have asked for financial

4   reduction sheets, the Defendants, and each of them, tell their clients' no such form

5   exist, or that the employee has never heard of the form. In fact, the form does exist,

6   and in some written government contracts across the United States that a majority

7   Defendants have with government agencies such as the Courts, probation, or even

8   parole, it states in clauses of that agreement that the client is entitled to a financial

9   reduction if the customer cannot afford the high-end fees. Defendants, and each of

10  them, have violated the rights of the Plaintiffs, and others similarly situated across

11  the United States. By doing this, Defendants, and each of them, have violated the

12  Due Process rights of the Plaintiffs, and all others similarly situated across the

13  United States, under the 14th Amendment to the United States Constitution.

14       82.    Defendants, and each of them, have perpetuated these Constitutional

15  violations under the color of authority. These Defendants have entered into

16  government contracts with City, State, County, and Federal government agencies.

17  In turn, these agencies provide Defendants with government identification cards,

18  they appear in Court on behalf of the government, transmit reports directly to the

19  Court staff, and they also make special appearances by flying their employees

20  around the globe to testify at the request of these government agencies. Further,

21  Defendants receive large pay outs each year for their alcohol monitoring service.

22       83.    Plaintiffs on behalf of themselves, and a class of similarly situated

23  seek to challenge the Defendants ongoing pattern and practice sending delayed

24  alleged consumption and tamper reports to their attorneys in a timely fashion. The

25  Plaintiffs believe and thereon alleged that this policy and practice is established,

26  created, and manifested in a way to intentionally cause harm and federal civil

27  rights violations towards the Plaintiffs and the putative class. Additionally, the

28  Plaintiffs believe and thereon allege that this policy and procedure was created

amongst the Defendants to further their conspiracy to violate the Plaintiffs federal civil rights. With the scram client being notified weeks, or even months later that the client allegedly consumed alcohol, or tampered with the device, the Defendants try to better themselves to bolster sales and government contracts by reflecting that the wearer cannot refute the Defendants allegations of violations because as most human beings, nobody remembers where they were a month or two ago. Further, the wearer is unable to obtain a blood draw in a timely fashion.

84.     Defendants will continue their aforementioned policies and practices unless enjoined and restrained by the Court. Without injunctive relief applicable to the class as a whole, the class members will suffer irreparable harm for which there is no adequate remedy at law in that their constitutional and statutory rights will be systematically violated. Without the intervention of this Court, Defendants will continue these unconstitutional practices.

85.     Defendants have the resources and money to properly change their illegal business practices, but they do not utilize those resources to curb the problems that the Defendants are aware of. Instead, some Defendants use those funds and resources to pay for extravagant parties, and boats. Defendants, by and through their illegal business practices will continue to receive government and local contracts and will continue to conduct business in a dehumanizing and discriminatory manner towards Plaintiffs and the class.

86.     On information and belief, the Defendants and each of them have retaliated against the Plaintiffs by creating and circumventing false tamper and consumption reports when the Plaintiffs and members of the class continue to complain to case managers about the high end exuberant fees that are imposed for the "setup fee" and the "bi-weekly fee," all of which the majority of the Plaintiffs here have complained about. On information and belief, Plaintiffs allege that the Defendants use false reports to remove clients from their case load when clients don't have funds to pay for the Defendants exuberant fees, all of which these false

1 reports are sent directly to a Judge of the Superior Court.

2     87.    As a result of the discriminatory conduct alleged herein, the Plaintiffs

3 and the class have suffered damages, including emotional distress damages and

4 pain and suffering, in amounts to be determined at trial.

5     88.    In engaging in the conduct alleged in this Complaint, Defendants, and

6 each of them, acted maliciously, fraudulently and oppressively, and otherwise in a

7 manner entitling Plaintiffs to an award of punitive damages.

8 ## VI.   CLAIMS OF CLASS REPRESENTATIVES

9     89.    Different and overlapping Plaintiffs are acting as representatives for

10 their classes. All Plaintiffs sue Defendant Alcohol Monitoring Systems, Inc.,

11 ("AMS"), as well as their alcohol provider in their respective states. The class and

12 class representatives identified in this graph below. In this graph, Alcohol

13 Monitoring Systems, Inc., will be referred to as AMS.

| NAME | STATE | DEFENDANT(S) |
|---|---|---|
| Bethany Lange | New York | Recovery Solutions Consulting & Training Corp<br>Alcohol Monitoring Systems, Inc. |
| Jennifer Oh | California | Los Angeles Alcohol Monitoring, Inc.<br>Alcohol Monitoring Systems, Inc. |
| Brooke Hoffman | South Dakota | Alcohol Monitoring Systems, Inc. |
| Micah Bailey | Louisiana | ETOH Monitoring, LLC.<br>Alcohol Monitoring Systems, Inc. |
| Linda Soltis | Ohio | Alcohol Monitoring Systems, Inc. |
| Derrick Smith | Texas | Recovery Healthcare Corporation<br>Alcohol Monitoring Systems, Inc. |
| Shiloh Irvin | Georgia | Sentinel Offenders Services, LLC.<br>Alcohol Monitoring Systems, Inc |
| Matthew Brudnicki | Illinois | Scram Systems of Illinois, Inc.<br>Alcohol Monitoring Systems, Inc. |
| James Roche | Florida | Court Programs, Inc.<br>Alcohol Monitoring Systems, Inc |
| Jennifer Johnston | Missouri | Alcohol Monitoring Systems, Inc. |
| Michael Spano | New York | Rocky Mountain Offender Mgmt Systems, LLC<br>Alcohol Monitoring Systems, Inc. |
| Toriahna Bonds | Michigan | House Arrest Services, Inc.<br>Alcohol Monitoring Systems, Inc. |

| | | |
|---|---|---|
| Dakota Jones | California | Scram of California, Inc.<br>Alcohol Monitoring Systems, Inc. |
| Dan McCullough | Georgia | ProntoTrak, Inc.<br>Alcohol Monitoring Systems, Inc. |
| Dusty Derigo | Indiana | Total Court Services of Indiana, LLC<br>Alcohol Monitoring Systems, Inc. |
| Angel Gonzales | California | Scram of California, Inc.<br>Alcohol Monitoring Systems, Inc. |
| Christina Bohnstedt | Minnesota | Midwest Monitoring and Surveillance, Inc., Minnesota<br>Monitoring, Inc., Alcohol Monitoring Systems, Inc. |

## VII.   FALSE THREATS OF JAIL FOR NONPAYMENT TO DEFENDANTS

90.     Plaintiffs further bring this litigation to challenge a second, illegal business practice by each of the Defendants—its practice of intentionally coercing people to pay the Defendants with false threats that nonpayment will result in immediate incarceration at the sole discretion of the case manager, or alcohol provider.  Plaintiffs, and each of them, was subject to this practice, as described herein.

91.     The Plaintiffs' alcohol providers, excluding law enforcement, has a practice of coercing payments from probationers by falsely representing that failure to pay fines and fees will result in immediate incarceration in their sole discretion ("the False Threats of Jail for Nonpayment Policy").

92.     Through this policy, Defendants have intentionally caused Plaintiffs, and others stress, anxiety, humiliation, and fear of incarceration. Defendants uses threats of incarceration to ensure that SCRAM clients will prioritize payments to each of the Defendants over other financial obligations, such as rent, child care, food or medical expenses.

93.     The threats made by Plaintiffs' SCRAM providers are inconsistent with the legal authority limiting the ankle monitor company's power to revoke their SCRAM conditions practice in this regard constitutes fraud and all other forms of misrepresentation under State and Federal law.

-24-

94.     Plaintiffs seek damages and declaratory and injunctive relief as set forth herein.

## VIII.     CLAIMS OF CLASS REPRESENTAIVES

*1.     Bethany Lange v. Recovery Solutions Consulting & Training Corp and Alcohol Monitoring Systems, Inc.*

95.     Plaintiff Bethany Lange, ("Ms. Lange or Plaintiffs") was driving her car in the City of Depew, the State of New York. As Ms. Lange was driving on the highway when she was pulled over by an Erie County Sheriff's Deputy. After being pulled over, the deputy suspected that Ms. Lange was driving under while under the influence of alcohol. Although there are conflicting issues as to the alleged allegations that Ms. Lange was intoxicated, Ms. Lange was subsequently placed under arrest for suspicion of DWI in the State of New York.

96.     Shortly after Ms. Lange was placed under arrest, Ms. Lange was taken to a local jail where she was required to post a bail bond. Ms. Lange posted a bail bond in the amount of $ 25,000.

97.     Ms. Lange retained private counsel and later appeared in the trial Court in the State of New York. Ms. Lange was later subsequently found guilty of DWI.

98.     On January 26, 2017, after sentencing, Ms. Lange was required to enroll in the SCRAM program with the DWI Court unit. After enrolling, Ms. Lange appeared at the DWI unit and was fitted for the SCRAM Device. Ms. Lange was provided with a piece of paper that contained a list of environmental products that a person wearing the SCRAM Device is prohibited from using.

99.     In addition to the list of prohibited products, Ms. Lange was also required to send a bi-weekly payment to Defendant Recovery Solutions Consulting & Training Corp., ("RSC").  In turn, RSC then transmits the payment to Alcohol Monitoring Systems, Inc., ("AMS") in Colorado.

1    100.   On several occasions, Ms. Lange fell back on her payments. When she

2  did, Ms. Lange would receive a telephone call from either the DWI Court unit, or

3  RSC. On various occasions, RSC employees will call Ms. Lange all hours late at

4  night. At one point, RSC called Ms. Lange at 11:00 p.m., at night while she was in

5  bed asleep. The RSC employee informed Ms. Lange that if she did not make her

6  payment "like right now," that Ms. Lange would be charged with a violation of her

7  SCRAM order.

8    101.   Like many other Americans facing a financial problem, Ms. Lange

9  was unable to pay the high end exuberant fees imposed by RSC and AMS. Ms.

10 Lange continued to fall back on her payments. Coincidentally, Ms. Lange was

11 charged with several SCRAM violations. Defendant RSC, acting under the color of

12 state law, sent various reports to the Court concerning Ms. Lange.

13   102.   Like her co-Plaintiffs, Ms. Lange was charged on various occasions

14 with alleged SCRAM violations.

15   103.   In early 2002, Defendants RSC and AMS entered into a written and/or

16 oral contract with the Erie County Superior Court, as well as the County to have

17 RSC and AMS provide the County of Erie with SCRAM monitoring. As a part of

18 this contract, Ms. Lange believes and thereon alleges that RSC and AMS are paid

19 approximately $ 400,000 a year from SCRAM monitoring.

20   104.   On several occasions, RSC and AMS reported to the DWI Court staff

21 and Court that Ms. Lange was in violation of her SCRAM conditions. Acting under

22 the color of authority, Defendant RSC and AMS reported to the Court that on four

23 separate occasions, Ms. Lange consumed alcohol. In fact, each of those times, at

24 no time did RSC, nor AMS ever provide Ms. Lange with copies of any alleged

25 consumption reports. Although Ms. Lange, through her attorney, demanded to be

26 provided with copies of the alleged consumption reports, RSC and AMS never did

27 provide Ms. Lange, or her counsel with the reports. At all times relevant, Ms.

28

-26-

Lange had an absolute right to know the charges that were filed against her, and to have the right to bring witnesses to testify on her behalf.

105.   Again, on May 30, 2017, Ms. Lange received a phone call from the Defendant RSC. Again, Ms. Lange was informed that she was in violation of her SCRAM conditions. Only this time, RSC, through a report generated by AMS, then transmitted to RSC, the report this time now said that Ms. Lange tampered with the SCRAM Device. And at the same exact moment and time, alcohol was also detected. But again, this is an impossibility due to the fact that the SCRAM Device cannot detect alcohol, if the SCRAM Device is being tampered with.

106.   Acting under color of authority, RSC then sent a confidential report to the Court that stated these above-mentioned allegations. In fact, the RSC employee contacted the Court, and the RSC employee informed the DWI Court staff that not only did Ms. Lange allegedly tamper with the SCRAM Device, but also that Ms. Lange continued to fall back on payments. As such, RSC, acting under the color of authority, provided a perjured statement to the DWI staff that directly caused a Court date to be set so that Ms. Lange would have to appear before a judge. For no well-founded reason, RSC and AMS manifested false allegations, refused to provide Ms. Lange with the reports, all for not making a payment to RSC and AMS, on time.

107.   Ms. Lange then appeared at the Court date, and was given a verbal reprimand by the trial Court about the alleged consumption and tamper. At no time did RSC and AMS ever prove that Ms. Lange allegedly violated the terms of her SCRAM sentencing. During the course of Ms. Lange's alleged violations, Ms. Lange was ordered to provide hair and urine samples to the DWI Court probation officers, and all of those tests were negative.

108.   Unless and until the Defendants RSC and AMS are restrained by an order of this Court, Defendants, acting through their officers, servants, agents and employees, will continue to enforce these violations and continue to delay reports that ultimately put a person's life and freedom in the hands of two notoriously corrupt corporations, RSC and AMS.

109.   Unless and until this Court declares the policies and procedures of RSC and AMS are unconstitutional, the Defendants, acting through its officers, servants, agents and employees, will enforce the said civil rights violations. All of the acts of the Defendants, its officers, agents, as alleged herein, were done or are threatened to be done under color of state law.

110.   The Defendants policies and procedures, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights allowed to others in similar situations and other protections of state and federal law. The said Defendants to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Bethany Lange.

111.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Bethany Lange has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

112.   In addition to compensatory, economic, consequential and special damages, Plaintiff Bethany Lange, and members of the is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff Bethany Lange.

### 2.     *Jennifer Oh v. Scram of California, Inc., Alcohol Monitoring Systems, Inc. and Los Angeles Alcohol Monitoring, Inc.*

113.   Plaintiff Jennifer Oh was arrested for driving under the influence on December 16, 2014. Ms. Oh was subsequently involved in a car accident with another car. A short time later, police arrived on scene and had opened a crash investigation. During that time, the police suspected that Ms. Oh was under the influence of alcohol. The investigating officer conducted field sobriety tests on Ms. Oh and alleged that Ms. Oh was in fact under the influence.

114.   Ms. Oh was read her Miranda rights and placed under arrest and then transported to the local police station where Ms. Oh posted bond. The police then provided Ms. Oh with a Court date to appear in Court.

115.   Several months later, Plaintiff retained private counsel and appeared at the trial Court to be arraigned on DUI related charges. At that time, Ms. Oh, by and through her attorney entered a not guilty plea. At the arraignment, her attorney made an offer of good faith to the Court to have Ms. Oh voluntarily enroll in the SCRAM ankle monitoring program. That same week, Ms. Oh enrolled in the SCRAM monitoring program with Defendant Los Angeles Alcohol Monitoring, Inc., ("LAAM").

116.   The criminal case was then postponed to give Plaintiff time to enroll in the SCRAM program. Several weeks later, Ms. Oh's attorney appeared before the trial Court and informed the Court that Ms. Oh enrolled in the SCRAM ankle program.

117.   While Ms. Oh was enrolled in the SCRAM program, Ms. Oh was then ordered to pay SCRAM $ 225.00 a week for SCRAM monitoring. In addition, the Plaintiff, Ms. Oh also paid LAAM a $ 325.00 enrollment fee.

118.   Once Ms. Oh was finally enrolled in the SCRAM program, Ms. Oh was then mandated to attend a seminar which was given by a LAAM employee. The seminar consisted of the do's and don'ts while on SCRAM. The LAAM employee instructed the Ms. Oh not to consume alcohol. The employee also gave an instruction that Ms. Oh not use any form of alcohol related environmental products. Ms. Oh agreed to both. At no time did LAAM provide Ms. Oh with any notice of this writing.

119.   During the time that Ms. Oh was placed on SCRAM monitoring, Ms. Oh continued to complain about the monthly SCRAM fee. Ms. Oh also asked the LAAM Defendant if the Plaintiff could apply to have her monthly costs reduced based on the facts that Ms. Oh could barely afford the monthly fee. However, the employee acting on behalf of LAAM informed Ms. Oh that she could not seek a reduced rate and that if Ms. Oh, did not pay the monthly fees, that LAAM would report Ms. Oh to the trial Court indicating that Ms. Oh was in violation of her SCRAM conditions.

120.   Facing the threats of arrest and detention and the possibility of losing her job, home and family, Ms. Oh choose to pay the huge fees to SCRAM and AMS. On June 8, 2015, weeks after Ms. Oh complained to her case manager about the outrageous fees assessed by LAAM and AMS, Ms. Oh's attorney was sent a violation report that Ms. Oh was in violation of her SCRAM monitoring conditions. The alleged times of consumption was June 5, 2015 to June 7, 2015.

121.   Ms. Oh's attorney did not receive the report for almost a month later. In that undated report, LAAM and AMS alleged that Ms. Oh consumed alcohol. On several occasions, both Ms. Oh and her attorney requested copies of the reports, but LAAM and AMS refused.

122.   Defendants AMS and SCRAM indicate that Alcohol detections have confirmed as consumption identify the Blood Alcohol Curve and include both the presence of absorption to the peak with an absorption rate less than 0.10% per hour and the presence of elimination with an elimination rate less than 0.025% per hour if the peak was less than 0.150% or less than 0.035% per hour if the peak is 0.150% or above. [Emphasis in original].

123.   Also attached to the report generated by AMS to SCRAM, is a graph sheet dated from the dates of June 5, 2015 at 6:00pm to June 7, 2015. The graph shows the trans-dermal concentration, ("TAC") levels just like in the graph of her co-Plaintiff. The TAC readings are the black line and are also represented on the scale sheet to the left of the graph sheet. It also reflects the Infrared, ("IR") readings identified on the blue line and the temperature readings are displayed on the red line and represented by the scale on the right of the graph.

124.   The graph is subsequently listed from June 5, 2015 at 6:00pm to June 7, 2015. During these two days, coincidentally, that TAC level stays the same as like her co-Plaintiff Jennifer Oh. Which by all accounts indicated that Ms. Oh drank for two days straight, a biological impossibility. During this time, AMS alleges that the TAC level stayed the same.

125.   Defendant AMS produced the report and was reviewed by LAAM, who in turn provided the alleged consumption report to the Court. Acting under the color of authority, LAAM contacted the trial Court Judge, and sought a bench warrant for the arrest of Ms. Oh. The report was then sent to the trial Court. At no time did LAAM, nor AMS have the legal authority to engage in an *ex parte* matter with the Court to ask questions, submit reports, and seek an arrest warrant.

126.   Like all Plaintiffs in this case, each time Ms. Oh uploads her daily SCRAM Device readings, the readings are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads

-31-

the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue. In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM Device by blocking the infrared system inside the Device, and consumed alcohol. But realistically speaking, the SCRAM Device cannot do both. If the SCRAM wearer is tampering with the SCRAM Device, then the SCRAM Device is unable to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

127.   Once the LAAM and AMS reports were finalized, Ms. Oh by and through her attorney appeared in the trial Court and defended against the false report allegations. Her attorney complained about not receiving the report in a timely fashion, all of which the Court noted.

128.   Had AMS properly and timely informed Ms. Oh of the alleged consumption report, then Ms. Oh could have located witnesses, or even provide dates and times as where she was at the time when the alleged tampers took place.

129.   Ms. Oh believes, and thereon alleges that LAAM and AMS have an ongoing established pattern and practice of delaying in turning over all violations reports weeks, or months later so that AMS can paint a picture of themselves in the eyes of law enforcement that the equipment of AMS actually works, and that the SCRAM wearer tampered with the SCRAM Device, and that the SCRAM customer is guilty of anything and everything that AMS alleges. With this policy in hand, corporations like AMS try's to show to government agencies that their ankle monitor really works, even though it does not.

130.   The policies and procedures manifested by AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants LAAM and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Jennifer Oh.

131.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Jennifer Oh has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

132.   In addition to compensatory, economic, consequential and special damages, Plaintiff Jennifer Oh, and members of the is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

### 3.    *Brooke Hoffman v. Alcohol Monitoring Systems, Inc.*

133.   Plaintiff Brooke Hoffman, ("Ms. Hoffman or Plaintiffs"), on the night of August 25th, 2016 was at her home and involved in an argument with her husband. To avoid a domestic dispute with her husband, Ms. Hoffman decided in her best interest that she would leave her home for a few hours. Shortly after leaving her home, Ms. Hoffman did in fact have a few drinks. Soon thereafter, as

-33-

Ms. Hoffman was driving, a person called police to notify them of a potential drunk driver. Minutes later, Ms. Hoffman was pulled over by a police officer.

134.   The officer then conducted a Nystagmus check on Ms. Hoffman's eyes using his finger. The officer then decided to conduct what is called Standard Field Sobriety Tests, ("SFST's") on Ms. Hoffman. Based on the officers' training and experience, the officer placed Ms. Hoffman under arrest for suspicion of DUI after Ms. Hoffman failed the (SFST's").

135.   On August 26, 2016, that day, Ms. Hoffman was released from jail and as a condition of her release, Ms. Hoffman was required to report to the Sheriff's office and have a member of law enforcement install the SCRAM Device on her leg. Ms. Hoffman was never provided with any literature, a brochure or a list of things Ms. Hoffman should do and not do while on the SCRAM Device.

136.   Additionally, Ms. Hoffman was then required to report twice a week to the Gregory County Sheriff's office to download her readings into a AMS database that is then sent to AMS after the readings are uploaded.

137.   It was then that a deputy sheriff informed her that sometimes the readings "don't upload correctly," and that "the AMS equipment often fails us." Further, the deputy also stated the AMS uploads download and transmit until a week later and could ultimately reflect as the AMS customer never reported that day to upload the readings and could generate a report reflecting that Ms. Hoffman is in violation of her release conditions.

138.   Ms. Hoffman then retained private counsel and appeared in the trial Court and entered a not guilty plea in the South Dakota Superior Court. During the course of the DUI proceedings, the Judge instructed Ms. Hoffman to abstain from using alcohol.

139.   Starting on April 5, 2017, at 8: 30 a.m., to April 6, 2017 till 2:06 p.m., it was alleged by SCRAM and AMS that Ms. Hoffman tampered with the SCRAM Device during this time period. It their report, AMS stated also that alcohol was

also detected from during this time period. This is an impossibility due to the facts that AMS advertises that when a customer attempts to defeat the technology by placing an object over or between the sensor (IR) system of the SCRAM Device, then the SCRAM Device is unable to reach out an absorb the sweat sample necessary to determine if the customer consumed alcohol. Based on the statements and omissions by the Defendants, it is clear that there is no way possible that the SCRAM Device can do both.

140.   Again, on April 7, 2017, at 2:05 p.m., to April 8, 2017 till 9:56 a.m., it was alleged again by AMS that Ms. Hoffman tampered with the SCRAM Device during this time period. This time period was alleged to have also exceeded almost 19 hours that AMS alleges Ms. Hoffman tampered with the SCRAM Device.

141.   However, this is an impossibility due to the facts that AMS advertises that when a customer attempts to defeat the technology by placing an object over or between the sensor (IR) system of the SCRAM Device for a long period of time, a report is generated and sent to the supervising agency that the SCRAM customer has or is attempting to defeat the technology of the SCRAM Device. And the agency conducting the supervision will then ask the SCRAM wearer to report immediately to that agency.

142.   Like all Plaintiffs in this case, each time Ms. Hoffman uploads all of her daily SCRAM Device readings which are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue. In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM

-35-

1   Device by blocking the infrared system inside the Device, and consumed alcohol.

2   But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

3   wearer is tampering with the SCRAM Device, then the SCRAM Device is unable

4   to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

5   143.   Due to the known defects within the SCRAM Device, it wasn't until

6   several days, or even weeks before the upload readings reached AMS in Colorado

7   before AMS notified the Sheriff's Department.

8   144.   In October of 2011, the Gregory County Sheriff's Department, GCSD,

9   entered into a written contract with AMS to provide ankle monitoring. In return,

10   the County of Gregory, South Dakota, paid AMS over $ 5,000,000.00 for a five (5)

11   year contract. In the written contract executed between the parties, AMS agrees to

12   provide witness support, real time technology, and reports that would reflect if a

13   AMS client tampered with the device, or consumed alcohol. This contract was then

14   signed and executed by the County Attorney and Don White the Chief Operations

15   Officer of AMS.

16   145.   Had AMS properly and timely informed Ms. Hoffman of the alleged

17   tamper, Ms. Hoffman could have located witnesses, or even provide dates and

18   times as where she was at the time when the alleged tampers took place.

19   146.   Ms. Hoffman believes, and thereon alleges that AMS have an ongoing

20   established pattern and practice of delaying in turning over any and all violations

21   reports weeks, or months later so that AMS can paint a picture of themselves in the

22   eyes of the Sheriff's Department that the equipment of AMS actually works, and

23   that the SCRAM wearer tampered with the SCRAM Device, and that the SCRAM

24   customer is guilty of anything and everything that AMS alleges. Without more, it

25   would cost AMS a multimillion dollar contract. Therefore, AMS must protect their

26   assets in a contract like this.

27

28

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

147.   The policies and procedures manifested by AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendant AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Brooke Hoffman.

148.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Brooke Hoffman has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

149.   In addition to compensatory, economic, consequential and special damages, Plaintiff Brooke Hoffman, and members of the is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

1

2

**4.    *Micah Bailey v. ETOH Monitoring, LLC. And Alcohol Monitoring Systems, Inc.***

3

4

150.    On December 30, 2016, Defendants ETOH and AMS generated a said false report that Mr. Bailey was in violation of the conditions of his bail bond.

5

6

151.    Defendants allege that on December 30, 2016 beginning at 9:04 p.m., continuing through December 31, 2016 that Mr. Bailey consumed alcohol.

7

8

9

10

152.    Specifically, the report by manifested by ETOH and AMS reflected that at 9:04 p.m., Mr. Bailey consumed an alcohol beverage and had a TAC reading of 0.012 which is equal to almost two and a half drinks. During the next four hours, the TAC level got higher and higher.

11

12

13

14

153.    At all times relevant, the Defendants ETOH and AMS knew that Mr. Bailey was also required to have an interlock device installed in his vehicle that would require Mr. Bailey to breathe into a tube and the interlock device would quickly determine if Mr. Bailey had consumed alcohol.

15

16

17

154.    In the report generated by the Defendants, the reports states that at 12:35 a.m., on December 31, 2016 that Mr. Bailey's TAC level was at 0.049 which is equal to four drinks and maintained a TAC level for the next 30 minutes.

18

19

20

21

22

23

24

25

26

155.    The report generated by the interlock device reflects something entirely different. Mr. Bailey who was leaving his job, got into his vehicle and blew a breath sample into the interlock at 1:49:42 a.m., and because Mr. Bailey had not consumed any alcohol, his vehicle promptly started at 1:49:49 a.m., which was about 7 seconds later giving the interlock device time to evaluate the breath sample. As such, Mr. Bailey's vehicle started and Mr. Bailey was able drive his vehicle to his home. At 2:02:10 a.m., Mr. Bailey arrived at his home and the interlock records show that his vehicle was stopped. The report from when Mr. Bailey started his vehicle at 1:49:49 a.m., shows no alcohol was consumed by him.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

156.   Despite the fact that ETOH and AMS knew that Mr. Bailey did not consume any alcohol, the Defendants, and each of them decided that it would be in Mr. Baileys best interest that he would be charged with a consumption violation anyways.

157.   Upon information and belief, in early 2010, Defendants AMS and ETOH entered into a written contract between AMS, ETOH, and the Louisiana Probation and Parole Department. Upon information and belief, Mr. Bailey alleges that between AMS, ETOH, and AMS, that the State of Louisiana pays AMS and ETOH for SCRAM monitoring of persons on probation, parole, and persons charged in the trial Court with a DUI related matter.

158.   Although Mr. Bailey was formally accused of consuming alcohol, it was not known to Mr. Bailey almost two weeks later. Defendants AMS and ETOH, acting under the color of authority, contacted the Louisiana Probation and Parole Department, and spoke to Officer Tiffany Eagles. During that contact, AMS and ETOH informed Officer Eagles that Mr. Bailey consumed alcohol and that the employee at ETOH, Christian Helmke would help and assist the probation and parole department with a warrant for Mr. Baileys arrest.

159.   On January 3, 2017, employees of ETOH, acting under the color of authority, contacted probation officer Tiffany Eagles, and ETOH filed an affidavit in support of an arrest warrant for the probation department that Mr. Bailey was allegedly in violation of his SCRAM monitoring conditions. The ETOH employee then provided a written report authored by AMS, that purportedly shows that on several days in the month of December of 2016, Mr. Bailey consumed alcohol on four separate occasions. Coincidentally, ETOH provided this alleged consumption report just two days after Mr. Bailey complained to the ETOH staff about the high end exuberant prices that ETOH charges for SCRAM monitoring. Mr. Bailey also expressed to the ETOH staff that Mr. Bailey had to pay for both the SCRAM ankle monitor, and an interlock device in his car. When Mr. Bailey informed ETOH that

1   Mr. Bailey could no longer afford the ETOH ankle monitoring, ETOH employee

2   Christian Helmke stated; "you want to go back to jail, right f_____ now man."

3        160.   Fearing for his life and liberty through the threats from the ETOH

4   staff, Mr. Bailey was forced to continue making a payment to ETOH every two

5   weeks in the amount of $ 200.00.

6        161.   Almost two months later, after ETOH and AMS turned over the false

7   consumption report to the Louisiana Probation and Parole Department, Mr. Bailey

8   attorneys is contacted concerning an alleged violation report manifested by ETOH

9   and AMS.

10       162.   On February 3, 2017, for the very first time with almost two months

11   passing by, Mr. Bailey's private attorney was notified that the Court in Louisiana

12   received a violation report that Mr. Bailey consumed alcohol. After his attorney

13   received the alleged consumption report, Mr. Bailey tried to prove his innocence

14   on several occasions. By doing so, Mr. Bailey furnished the print out reports from

15   his interlock device that shows that Mr. Bailey was able to start his vehicle on the

16   same date and time and ETOH and AMS alleged in their report to the probation

17   officer. To no avail, the probation department refused to listen to Mr. Bailey. Both

18   ETOH and AMS pressed local probation officers into filing charges against Mr.

19   Bailey simply because he could no longer afford the SCRAM ankle monitoring.

20       163.   On March 23, 2017, Mr. Bailey was ordered to appear in State Court.

21   During the hearing, Defendants introduced their traditional false report. What was

22   most shocking to all, including the trial Court was how off the AMS and ETOH

23   report was in various ways. Most notably, in the alleged consumption report, AMS

24   reflects that Mr. Baileys date of birth is "1-5-2016."

25       164.   What's most disturbing about the consumption reports generated by

26   AMS, distributed by ETOH, is that both corporations have unique ways to altered

27   and manipulate the alleged consumption reports to reflect anything that AMS and

28   ETOH want their reports to reflect.

1

165.   Like all Plaintiffs in this case, each time Mr. Bailey uploads all of his

2

daily SCRAM Device readings which are then transmitted from the SCRAM

3

Device, to a AMS' central facility in Littleton, Colorado where a minimum wage

4

employee with no training experience, no college certification, purportedly reads

5

the alleged consumption report and issues a determination whether or not the

6

SCRAM wearer consumed alcohol. Based on confidential information obtained by

7

a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives

8

the power and authority to this non-certified, minimum wage employee is allowed

9

to "pick and choose" which or what type of violation to issue. In some instances,

10

the AMS employee picks both that the SCRAM wearer tampered with the SCRAM

11

Device by blocking the infrared system inside the Device, and consumed alcohol.

12

But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

13

wearer is tampering with the SCRAM Device, then the SCRAM Device is unable

14

to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

15

166.   Acting under the color of authority, AMS and ETOH contracts with

16

the local probation department to provide the government entities in the State of

17

Louisiana with ankle monitoring services. In return, the State of Louisiana pays

18

millions of dollars to AMS and ETOH. In exchange, AMS and ETOH work hand

19

in hand with local prosecutors and probation/parole offices to put innocent people

20

behind bars. Additionally, upon information and belief, in the written contract that

21

AMS and ETOH have with the government agencies in Louisiana, that Mr. Bailey

22

believes that in the written contract, that AMS and ETOH have with government

23

agencies, that AMS and ETOH are required to send an employee of AMS and/or

24

ETOH to testify against the SCRAM client in the event that a violation occurs.

25

167.   Had AMS and ETOH properly and timely informed Mr. Bailey of the

26

alleged consumption within a timely manner, then Mr. Bailey could have located

27

witnesses, and exercised his right to call those witnesses to trial, however because

28

months went by before Mr. Bailey was first notified of the alleged violation, Mr.

1   Bailey was unable to contact, much less locate witnesses from his job to testify on

2   his behalf.

3   168.   Mr. Bailey believes, and thereon alleges that AMS and ETOH have an

4   ongoing established pattern and practice of delaying in turning over any and all

5   violations reports weeks, or months later so that AMS, ETOH, and other third

6   party alcohol providers can paint a picture of the SCRAM client that he or she is

7   guilty in the eyes of the government agencies, and that the equipment of AMS

8   actually works, and that the SCRAM wearer consumed alcohol while on the said

9   SCRAM Device, and that the SCRAM customer is guilty of anything and

10   everything that AMS and ETOH alleges. Without more, it would cost AMS a

11   multimillion dollar contract. Therefore, AMS and ETOH must protect their assets

12   in a contract like this one that brings in $ 500,000 a year.

13   169.   The policies and procedures manifested by AMS and ETOH, flat on

14   its face and as applied, or threatened to be applied, violates the Right to Petition

15   and the Equal Protection Clause of the Fourteenth Amendment to the United States

16   Constitution and similar guarantees in the Constitution by denying Plaintiff free

17   speech rights, and the right to petition the Court, and to others in similar situations

18   and other protections of state and federal law. The Defendants AMS and ETOH to

19   this claim at all times relevant hereto were acting pursuant to a custom, policy,

20   decision, ordinance, regulation, widespread habit, usage, or practice in their actions

21   pertaining to Plaintiff Micah Bailey.

22   170.   Mr. Bailey had a constitutional right guaranteed to him by the United

23   States Constitution, to know what the charges are against him, to be provided with

24   exculpatory evidence that would help exonerate him. Defendants AMS and ETOH,

25   acting under the color of authority denied Mr. Bailey of his well-established rights

26   guaranteed to him. At all times relevant, both AMS and ETOH are a person within

27   the meaning of 42 U.S.C. § 1983.

28

-42-
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

171.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Micah Bailey has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

172.   In addition to compensatory, economic, consequential and special damages, Plaintiff Micah Bailey is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**5.    *Linda Soltis v. Alcohol Monitoring Systems, Inc.***

173.   Plaintiff Linda Soltis, ("Ms. Soltis or Plaintiffs") was arrested for driving under the influence on April 2, 2017. Ms. Soltis was released that same night with a written promise to appear on her own behalf at a later date in Court. Ms. Soltis was cited for DUI as well as failure maintain lanes.

174.   On April 7, 2017, Ms. Soltis moved to retain private counsel and appeared in the trial Court and entered a formal not guilty plea by and through her retained counsel. In the State Court of Ohio, Ms. Soltis was required to abstain from using alcohol and as a condition of bond, Ms. Soltis was required to enroll and wear the SCRAM Device.

175.   On April 7, 2017, Ms. Soltis was required to report to the probation department where a probation officer attached the SCRAM Device. In addition, Ms. Soltis was provided approximately 10 pages of conditions of her bond and additional material related to wearing the SCRAM Device. Ms. Soltis was then required to initial each of the 10 pages and Ms. Soltis requested but was not

1   provided copies of each of the forms. Among the forms was also documentation

2   indicating, among other things, a list of environmental products not to use.

3      176.   On April 17, 2017, Ms. Soltis was at her place of employment and

4   saw that she had two missed calls from the Ohio State Courts. Those phone calls

5   where in fact from the probation department and a probation officer informed Ms.

6   Soltis to come to the probation office and provide a urine sample. When Ms. Soltis

7   arrived at the probation office, Ms. Soltis was informed that probation received a

8   violation report stating that on April 13, 2017 and April 14, 2017 that Ms. Soltis

9   consumed alcohol for a period of 12 hours. Further Ms. Soltis was also informed

10   that not only was the report for consumption, but indicated that there was a tamper

11   reading, an impossibility.

12      177.   However, at no time did the probation department ever provide Ms.

13   Soltis with copies of any alleged violation reports. Further, Ms. Soltis's attorney

14   requested the reports directly from the alcohol provider that the County and State

15   contracts with for ankle monitoring service. At various dates and times unknown to

16   Ms. Soltis, various counties, and the State of Ohio entered into a written contract

17   with AMS sometime around 2006. Acting under the color of authority, Defendant

18   AMS sends its employees to the State of Ohio where the AMS employee meets

19   with various probation officers, and judges across the State of Ohio. In turn, AMS

20   entered a clause in their written contract that states that AMS fly out an employee

21   from Colorado to testify at all alleged violation hearings.

22      178.   Just like this case here, an AMS employee was flown out to the State

23   of Ohio, and Ms. Soltis, nor her attorney was ever informed that the AMS worker

24   was coming to Ohio to testify. Acting in concert with government officials, and

25   local prosecutors, the AMS employees are instructed by the prosecution and the

26   local governments not to have conversations with defense attorneys, nor any of the

27   SCRAM clients.

28

179.   Ms. Soltis appeared in front of a Magistrate on April 17, 2017 and it was there the District Magistrate Judge called into question the reliability of the device and ordered the probation officer to remove and change the SCRAM Device. The Magistrate Judge refused to rule on the alleged SCRAM violation and referred the case to a District Judge.

180.   On May 22, 2017, with no notice, Ms. Soltis's attorney was just provided with the alleged AMS report just 40 minutes prior to the hearing. This was also confirmed by an Ohio probation officer during the hearing concerning Ms. Soltis. The judge then asked Ms. Soltis's attorney if he wanted an extension of time due to the reports being turned over at the last minute, and her attorney accepted the extension. The Judge then set a June 8, 2017 as the next hearing date.

181.   Further, Ms. Soltis was never informed that a AMS employee was flown out to Ohio to testify. Acting under the color of authority, when the AMS employee finally arrived, the AMS employee did exactly what the local prosecutor told him to do and that was to provide the alleged report 40 minutes before the hearing.

182.   Like all Plaintiffs in this case, each time Ms. Soltis uploads all of her daily SCRAM Device readings which are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue. In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM Device by blocking the infrared system inside the Device, and consumed alcohol. But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

-45-

wearer is tampering with the SCRAM Device, then the SCRAM Device is unable to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

183.    Defendant AMS, acting under the color of authority, had a duty to provide Ms. Soltis with copies of any and all alleged copies of reports that were filed against her. As a direct and proximate result of the acts and omissions of AMS, Ms. Soltis's federal civil rights were violated that prevented Ms. Soltis from knowing what he was charged with, and the opportunity to call witnesses. As a result of the violations caused by the Defendants, Ms. Soltis only seeks redress for the business policies and procedures that Defendant AMS conspired to carry out such a denying Ms. Soltis and all others similarly situated their rights to have copies of all reports turned over to them in a timely manner.

184.    Ms. Soltis believes, and thereon alleges that AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that AMS alleges. Without more, it would cost AMS a multimillion dollar contract. Therefore, AMS must protect their assets in a contract like this one that brings millions of dollars thanks to the local tax payers,

185.    The policies and procedures manifested by AMS, flat on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. Defendant AMS to this claim and at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance,

1   regulation, widespread habit, usage, or practice in their actions pertaining to

2   Plaintiff Linda Soltis.

3       186.   Ms. Soltis had a constitutional right guaranteed to him by the United

4   States Constitution, to know what the charges are against him, to be provided with

5   exculpatory evidence that would help exonerate him. AMS, acting under the color

6   of authority denied Ms. Soltis of his well-established rights guaranteed to her. At

7   all times relevant, AMS is a person within the meaning of 42 U.S.C. § 1983.

8       187.   As a proximate result of Defendants' unlawful conduct, Plaintiff has

9   suffered actual physical and emotional injuries, and other damages and losses as

10  described herein entitling her to compensatory and special damages, in amounts to

11  be determined at trial. As a further result of the Defendants' unlawful conduct, the

12  Plaintiff Linda Soltis has incurred special damages and other special damages

13  related expenses, in amounts to be established at trial. Plaintiff is further entitled to

14  attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and

15  costs as allowable by federal law.

16      188.   In addition to compensatory, economic, consequential and special

17  damages, Plaintiff Linda Soltis is entitled to punitive damages against each of the

18  individually named Defendants under 42 U.S.C. § 1983, in that the actions of each

19  of these Defendants have been taken maliciously, willfully or with a reckless or

20  wanton disregard of the constitutional rights of the Plaintiff, as well as members of

21  the class.

22      **6.      *Derrick Smith v. Recovery Healthcare Corporation and Alcohol***

23  ***Monitoring Systems, Inc.***

24      189.   Plaintiff Derrick Smith, ("Ms. Smith or Plaintiffs") was on the night

25  of February 8, 2014, driving his vehicle to the local grocery store to pick up some

26  food items. Once Mr. Smith pulled into the parking lot, a police officer observed

27  Mr. Smith pulling into the parking lot. Mr. Smith went into the grocery store, got

28  some items and got in his vehicle and proceeded to drive off.

-47-

190.   Minutes later, a police officer in from the Carrollton Police Department began following Mr. Smith. At some point, the police officer decided to pull Mr. Smith over. During the stop, the police officer asked to search Mr. Smith's vehicle, in which Mr. Smith consented. Moments later, a DWI officer arrived on scene and began asking Mr. Smith if he consumed alcohol. Mr. Smith was required to perform some field sobriety tests to determine to what extent, if any, Mr. Smith had been drinking. Mr. Smith was also asked by the police officer to submit to a blood test, and Mr. Smith declined.

191.   Based on reasonable suspicion, Mr. Smith was placed under arrest and taken to a local jail facility where Mr. Smith was required to post a bail bond in the amount of $ 2,500.00.

192.   Mr. Smith was later ordered to appear in the State Court of Texas for allegations of a DWI charge. Mr. Smith later retained private counsel. During the course of the criminal case, Mr. Smith subsequently went to a jury trial and lost the case at trial. Mr. Smith was permitted to stay out on bond pending an appeal that Mr. Smith filed. As a condition of being out on bond, Mr. Smith was ordered by the trial Court to enroll in the SCRAM monitoring program with local corrupt corporation, Recovery Healthcare Corporation, ("RHC") that supplies citizens of the State of Texas with alcohol monitoring from the manufacture of the SCRAM Device, Alcohol Monitoring Systems, Inc., "(AMS").

193.   In 2011, Defendant RHC entered into various contracts with almost every County Court in Texas to provide SCRAM monitoring service to citizens in at least 56 counties. In the written contract, RHC and AMS agreed to enter into written contracts to provide the Denton County District Court with SCRAM ankle monitoring. As such, the written contract was entered by RHC, with AMS' strict approval, and then the contract was signed by a local judge. In exchange, both RHC and AMS locked in a contract that guaranteed RHC an annual contract with the Court in the sum of $ 149,000.

-48-

194.   Once the contract was finalized, Defendants RHC and AMS, acting under the color of authority, received a check from the County of Denton for all upfront costs to start the contract services. Sometime after the written contract was finalized by RHC, AMS, and the County of Denton, the municipality then sent several checks payable to RHC. Check numbers 20120207 and 20120228 were in the amounts of $ $ 4,500, plus dollars. Defendant RHC then transmitted a majority of those funds back to Colorado to Defendant AMS.

195.   What occurred next was even more disturbing. An employee that was employed with RHC named Jesus Armando Ordonez who was overseeing any and all SCRAM and drug testing for RHC, was arrested by the Brazon County Sheriffs Department. Mr. Ordonez who had been employed with RHC, was accused of falsifying and destroying drug and alcohol reports. Mr. Ordonez, acting through the scope of his employment at RHC would inform DWI criminal Defendants that were placed on SCRAM and drug testing schedules by the Court, that tests were positive for drugs and alcohol. Mr. Ordonez would then contact the SCRAM client and inform the SCRAM wearer that it would "cost 100.00 bucks to get a clean urine test submitted," all according to a federal indictment. Further, what was noted that RHC was raking hundreds of thousands of extra monies based on illegal business practices.

196.   Mr. Smith believes and thereon fully alleges that RHC and AMS increased their profits by over 200 % and, Mr. Smith also believes and thereon alleges that the President and CEO Mr. Larry Vanderwoude knew about the crimes taking place in RHC, but failed or refused to take any correction action due to both RHC and Mr. Vanderwoude benefiting from extra monies at the end of the month.

197.   Since the arrest and conviction of Mr. Ordonez, to date, hundreds of SCRAM violations, and drug tests results have been overturned. Leaving over 300 people and citizens of Texas without any form of justice.

198.   Mr. Smith believes that he was one of those victims. However, because Mr. Smith's conviction is currently under appeal, Mr. Smith now only seeks to hold Defendant RHC and AMS liable for their internal procedures. After Mr. Smith complained to RHC staff at various times, and places about the high end exuberant prices, coincidentally Mr. Smith was charged with an alleged SCRAM violation.

199.   On August 19, 2016, Mr. Smith complained to his case manager at RHC about the costs of the SCRAM Device monitoring fees and asked his case manager for a financial reduction. Ms. Smith appeared at the local RHC office to fill out what is known as the financial reduction sheet, and ask that his weekly payments be lowered. However, Mr. Smith's case manager informed him that there was never such a form "since I been working here," and the case manager rambled on by stating; "you are dreaming pal."

200.   Mr. Smith then asked the case manager to speak with a RHC supervisor. However, he was not permitted, but instead was informed by the case manager, that if Mr. Smith continued to seek a reduction, and not make the demanded payment by RHC, then Mr. Smith would be in violation of his bond and release conditions, and that RHC and AMS would "immediately" inform the Court that Mr. Smith is violation. Seeing that Mr. Smith would not leave the RHC office until he received a financial reduction, RHC employees decided to call the police.

201.   A short time later, officers arrived from the local police department. The case manager informed Mr. Smith that he was under arrest, and the RHC employee began reading Mr. Smith his Miranda rights. At some point, the police informed the case manager that this was a civil issue, and that the police could not assist in this matter and left the RHC office.

202.   Coincidentally, several days later, RHC and AMS alleged that Mr. Smith consumed alcohol on Augsut 21, 2016, just a few days after filing numerous complaints with RHC.

203.   On August 21, 2016, the report that is created by AMS stated that Mr. Smith consumed alcohol beginning on August 21, 2016 continuing to August 22, 2016 at various hours of the night. As such, Defendant AMS issued an alleged report, and transmitted that report to Defendant RHC from their headquarters in Littleton, Colorado. Once the report was reviewed by AMS staff, it is then reviewed by Defendant RHC, who in turn, both Defendants are required to turn over the alleged reports to Mr. Smith and his attorney of record. At all times, RHC and AMS knew the name, address, and phone number to Mr. Smith's attorney of record, but failed and refused to send the report to his attorney. Instead, AMS and RHC through their formed conspiracy, decided to only send the alleged violation report to the local prosecutor. In fact, Mr. Smith did not learn about the alleged SCRAM violation until almost two months later. Mr. Smith's attorney contacted RHC and demanded copies of the reports. But RHC again, refused to provide any copies of any alleged violation reports to his counsel. With weeks passing by, the attorney for Mr. Smith had to contact the local probation department to get copies of the alleged consumption report filed against his client Mr. Smith.

204.   Like all Plaintiffs in this case, each time Mr. Smith uploads all of his daily SCRAM Device readings which are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue. In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM Device by blocking the infrared system inside the Device, and consumed alcohol. But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

wearer is tampering with the SCRAM Device, then the SCRAM Device is unable to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

205.   Defendants RHC and AMS, acting under the color of authority, had a duty to provide Mr. Smith with copies of any and all alleged copies of reports that were filed against him. As a direct and proximate result of the acts and omissions of Defendants RHC and AMS, Mr. Smith's federal civil rights were violated that prevented Mr. Smith from knowing what he was charged with, and the opportunity to call witnesses. As a result of the violations caused by the Defendants, Mr. Smith only seeks redress for the business policies and procedures that Defendants RHC and AMS conspired to carry out thereby denying Mr. Smith and all others similarly situated their rights to have copies of all reports turned over to them in a timely manner.

206.   Mr. Smith believes, and thereon alleges that RHC and AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS, RHC, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that RHC and AMS alleges. Without more, it would cost AMS a multimillion dollar contract. Therefore, RHC and AMS must protect their assets in a contract like this one that brings millions of dollars thanks to the local tax payers,

207.   The policies and procedures manifested by RHC and AMS, flat on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants RHC and AMS to

-52-

this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Derrick Smith.

208.   Mr. Smith had a constitutional right guaranteed to him by the United States Constitution, to know what the charges are against him, to be provided with exculpatory evidence that would help exonerate him. Defendants RHC and AMS, acting under the color of authority denied Mr. Smith of his well-established rights guaranteed to him. At all times relevant, both RHC and AMS are a person within the meaning of 42 U.S.C. § 1983.

209.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Derrick Smith has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

210.   In addition to compensatory, economic, consequential and special damages, Plaintiff Derrick Smith is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

1
2

### 7.    *Shiloh Irvin v. Sentinel Offenders Services, LLC. and Alcohol Monitoring Systems, Inc*

3
4
5
6
7

211.   Plaintiff Shiloh Irvin, ("Mr. Irvin or Plaintiffs") was enrolled in an outpatient rehabilitation center. While attending the outpatient program, Mr. Irvin consumed one beer while in the program. During that time, Mr. Irvin was required to abstain from the use of alcohol and drugs. Even though Mr. Irvin did not have a problem with drugs, both ordered applied to him.

8
9
10
11

212.   After the outpatient staff discovered that Mr. Irvin consumed alcohol, that matter was reported to the Union County Superior Court. Soon thereafter, Mr. Irvin was required to make a court appearance in the Superior Court to answer to the consumption allegations.

12
13
14
15
16
17
18
19

213.   Once Mr. Irvin appeared in Court, the trial Court issued an order that Mr. Irvin report to Sentinel Offender Services, L.L.C., ("SOS") to be placed on SCRAM ankle monitoring. Once Mr. Irvin appeared in Court, the Judge gave him only 24 hours to report to SOS. The following day, Mr. Irvin appeared at the SOS to be placed in the SCRAM program. Once at the SOS office, Mr. Irvin was first informed that Mr. Irvin needs to pay $ 200.00 every two weeks to SOS, or that he would be in violation of his SCRAM conditions and arrested by SOS and put back in jail. The SOS employee also stated that SOS can "put a person in jail anytime."

20
21
22
23
24

214.   Mr. Irvin began asking how that was possible, and the SOS employee stated; "because we are private probation officers and we have police powers." A few minutes later a SOS employee arrived and placed a SCRAM Device on Mr. Irvin and then provided him with a list of environmental products not to use. Mr. Irvin was informed that "all payments had better be on time, or else."

25
26
27
28

215.   Several weeks later, SOS and their co-Defendant AMS alleged that Mr. Irvin consumed alcohol on December 17, 2016. Further, SOS and AMS alleged that Mr. Irvin consumed alcohol for over 20 hours straight. On December 17, 2016, AMS generated a report reflecting that Mr. Irvin consumed alcohol. Like

1    all other Plaintiffs, and members of the class, when a person or Plaintiff is accused

2    of a SCRAM violation, a report starts with Defendant AMS and is generated at

3    their corporate office in Littleton, Colorado. Once a minimum wage, non-trained

4    employee reviews the alleged report, it is then transmitted to Defendant SOS who

5    also reviews the report. It is then the duty of SOS to transmit the alleged violation

6    reports to the Court, and the agency who supervises the SCRAM client.

7       216.   On December 28, 2016, Mr. Irvin learned the hard way about an

8    alleged SCRAM violation. When Mr. Irvin appeared at the office of SOS. Mr.

9    Irvin stopped in to make a payment to his case manager and private probation

10    officer. After the manager/officer collected the SCRAM fee from Mr. Irvin, the

11    manager then for the very first time informed Mr. Irvin that he was in violation of

12    his SCRAM condition of the Courts order. Further, the manager/office also

13    informed Mr. Irvin that he had a warrant for his arrest. As such, the private

14    probation officer, acting under the color of authority, instructed Mr. Irvin to stand

15    up and place his hands behind his back. Mr. Irvin complied and the private

16    probation officer placed handcuffs on Mr. Irvin and telephoned the local Sheriff.

17       217.   Defendant Sentinel Offender Services, L.L.C., is a private corporation

18    that has offices all over the United States. Defendant SOS is given full police

19    powers by various states in the United States. Acting under the color of authority,

20    SOS employees are required to attend police academies along with real members

21    of law enforcement. Various states, provide SOS with firearm permits and official

22    looking police badges that often replicate real police badges. Up until 2014, SOS

23    had enough power given to them by various states, that SOS employees were free

24    to do anything and everything.

25       218.   Most notably, SOS entered into written contracts with the State of

26    Georgia and various counties. In that contract, SOS was given immunity, police

27    powers, and full supervision to do anything they wanted. With that said, SOS took

28    that to understand that they will do just that.

219.   Once government contract was signed, and immunity applied to SOS and their employees, SOS began robbing from the poor, threatening the innocent, and jailing people for failure to pay. As an example, several people who were places on misdemeanor probation in California, Colorado, Georgia, and seven other states, SOS began forcing clients to submit to drug testing, and forcing the client to pay for those tests. Acting under the color of authority, when the client refused to pay, SOS then used their official police powers to arrest and incarcerate people. Further, SOS then starting collecting what was purportedly "restitution" fees that was owed to the various counties and states, and SOS pocketed those funds bolstering their annual income to an extra $ 38,000,000.00 during the 2015 and 2016 fiscal year.

220.   Once the truth came to light, SOS was caught red handed violating people's rights. As a direct and proximate result of the actions of SOS, over 27 State and Federal lawsuits were filed. To make matters worse, despite pending civil litigation, SOS still carried out their criminal and civil misconduct.

221.   Further, SOS was also caught by one of their own employees that informed the government that SOS employees and supervisors were "smudging" results to put innocent people back in jail for violations that the person never committed. The conspiracy kept up despite lawsuits and criminal investigations.

222.   As a direct result of the actions of SOS and AMS, the Georgia Supreme Court had to intervene and issue rulings to shut SOS down. To collect money by any means, SOS would extend the probation sentences for people who had an inability to pay, for failure to pay in misdemeanor cases which meant more monthly fees for SOS. As one Supreme Justice put it; "sentinel is robbing peter to pay paul." Further, in a federal investigation headed by the FBI, Georgia House Minority Leader Stacey Adams stated; If they couldn't afford $ 130.00, why would sentinel assume they can afford $ 270.00."

223.   Mr. Irvin discovered the alleged SCRAM violation three weeks later on the date that he was arrested by SOS employees, and then turned over to the local Sheriff. Mr. Irvin was able to visit a state certified lab after being released from the jail. Mr. Irvin paid for a hair follicle test, all of which was negative. And once the results were made public, Mr. Irvin appeared with his counsel in Court to contest the violation. Because Mr. Irvin had a suspended jail sentence, Mr. Irvin was facing an automatic 21-year prison sentence from the alleged violation that was perpetuated by SOS and AMS. Once at the hearing, the trial Court found the SCRAM Device to be unreliable, and by order, dismissed the alleged violation, and Mr. Irvin was free to go.

224.   At all times relevant, SOS and AMS were acting under the color of authority pursuant to a written contract that provides SOS with police powers issued to them by various states in the United States.

225.   Mr. Irvin believes, and thereon fully alleges that SOS and AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that SOS and AMS, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of that is manufactured by AMS actually works, and that the SCRAM client consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that SOS and AMS alleges. Without more, it would cost SOS a multimillion dollar contracts from various states if word got out. So SOS and AMS must protect their assets in a contract like this one that brings millions of dollars thanks to the local tax payers.

226.   The policies and procedures manifested by SOS and AMS, flat on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free

speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants SOS and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Shiloh Irvin. In addition, all charges were terminated in Mr. Irvin's favor.

227.   Mr. Shiloh had a constitutional right guaranteed to him by the United States Constitution, to know what the charges are against him, to be provided with exculpatory evidence that would help exonerate him. Defendants SOS and AMS, acting under the color of authority denied Mr. Irvin of his well-established rights guaranteed to him. At all times relevant, both SOS and AMS are a person within the meaning of 42 U.S.C. § 1983.

228.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Shiloh Irvin has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. Mr. Irvin also suffers from extreme nightmares from this incident.

229.   In addition to compensatory, economic, consequential and special damages, Plaintiff Shiloh Irvin is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

1   **8.   Matthew Brudnicki v.  Scram Systems of Illinois, Inc. and Alcohol**
2   **Monitoring Systems, Inc.**

3   230.   Plaintiff Matthew Brudnicki, ("Mr. Brudnicki or Plaintiffs") was on
4   the night of August 1, 2016, was having a night out on the town when an argument
5   erupted between Mr. Brudnicki and the mother of his children. After having some
6   words exchanged, Mr. Brudnicki decided to get into his vehicle and drive home
7   from a local establishment. A short time later, a person called the Boone County
8   Sheriff's Department to report a suspicious drunk driver. Once a deputy arrived,
9   Mr. Brudnicki was pulled over and the officer asked if Mr. Brudnicki had anything
10  to drink that night. Mr. Brudnicki stated no, and when asked if he would consent to
11  a breathalyzer, Mr. Brudnicki refused. As a result of the refusal, Mr. Brudnicki was
12  placed under arrest. A short time later, Mr. Brudnicki was transported to the local
13  jail where he was booked on suspicion of DUI. Mr. Brudnicki posted a $ 3,000 bail
14  bond and was released from the jail in Boone County.

15  231.   Several weeks later, Mr. Brudnicki retained private counsel and
16  appeared in the trial Court for arraignment of a DUI allegation charges. Once in
17  Court, Mr. Brudnicki had his bond increased to the amount of $ 25,000 and as a
18  condition of his release, Mr. Brudnicki was required to enroll in the SCRAM ankle
19  monitoring program with Scram Systems of Illinois, Inc., ("SSI").

20  232.   On the night of November 12, 2016, SSI alleges that Mr. Brudnicki
21  consumed alcohol even through urine and hair tests proved otherwise. At the time
22  that SSI alleged that Mr. Brudnicki was drinking alcohol, was the same exact time
23  that Mr. Brudnicki was home in bed asleep.

24  233.   On November 19, 2016, Mr. Brudnicki went to make a bi-weekly
25  payment to SSI at their office. While there, Mr. Brudnicki was informed for the
26  very first time that Mr. Brudnicki was allegedly in violation of his SCRAM bail
27  bond conditions. Mr. Brudnicki requested to have copies of any and all alleged
28  reports, but was told by a SSI that he could not have copies and that they would be

-59-

turned over to his attorney at a later time. That same day after Mr. Brudnicki received information from SSI, Mr. Brudnicki went to a state certified medical lab to have a hair follicle test done, and the results were negative. With the results in hand, Mr. Brudnicki appeared back at the SSI office and provided copies of the finding from a state certified medical lab. However, SSI was unwilling to listen to Mr. Brudnicki. Again, Mr. Brudnicki asked for copies of the violations reports, and SSI refused.

234.    Several weeks later, AMS turned over an alleged consumption report that was verified by AMS, to SSI that consisted on an alleged violation report, as well as a SCRAM graph sheet that goes on to purportedly show that Mr. Brudnicki consumed alcohol. Both AMS and SSI delayed in turning over the alleged reports to Mr. Brudnicki's attorney of record.

235.    At a date unknown to Mr. Brudnicki, Defendant SSI and AMS entered into a written contract with the State of Illinois, and various counties in the State to provide alcohol monitoring by SSI and AMS.[1]

236.    Upon information and belief, Mr. Brudnicki believes and thereon fully alleges that the State of Illinois has provided actual police powers to SSI and AMS in various counties where Defendants have written contracts with various counties and the State itself. On several occasions, Mr. Brudnicki fell back on payments to SSI and AMS due to having to pay $ 225.00 every other week to SSI and AMS, and each time Mr. Brudnicki was paid a visit by employees of SSI accompanied by local police. Actual SSI employees were even seen riding in police vehicles.

237.    Additionally, each time Mr. Brudnicki fell back on a payment, SSI would send threating letters to Mr. Brudnicki that SSI and AMS would be sending violation letters and/or reports to the Court and his bail bondman. And to make

---

[1]  Defendants Scram Systems of Illinois, Inc., and Alcohol Monitoring Systems, Inc. are two corporations owned by the same business owners, but operate in two different states, and under two different business names. But are considered by Mr. Brudnicki to be one, and in the same.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

things even far worse, SSI and AMS sent letters to Mr. Brudnicki reflecting a money balance that was owed to SSI and AMS for ankle monitoring service. And that this letter was deemed a letter also indicating that Mr. Brudnicki breached the contract with SSI and AMS even though Mr. Brudnicki never signed any contract with SSI, nor AMS for ankle monitoring service.

238.   Defendants SSI and AMS have an established ongoing pattern and practice of using any means necessary to collect outstanding money from SCRAM clients. This includes, but not limited detaining SCRAM clients in various offices, using threatening letters, deploying law enforcement, sending false reports to the Court and other agencies, and sending their employees to the client's home in the middle of the night to collect SCRAM monitoring balances.

239.   Defendants SSI and AMS knew or had reason to know that a person's inability to pay a private corporation some outstanding balances for their services, cannot subject any person of the United State Territories to arrest, threats, or even detention to collect monies from their client's. This conduct clearly amounts to violations to Mr. Brudnicki's due process rights guaranteed to him under the United States Constitution.

240.   Plaintiff Matthew Brudnicki believes, and thereon fully alleges that he was subjected to retaliation and false consumption reports for his failure to pay the monies that were outstanding to SSI and AMS.

241.   Mr. Brudnicki believes, and thereon alleges that SSI and AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS, SSI, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that SSI and AMS alleges.

242.   Like all Plaintiffs in this case, each time Mr. Brudnicki uploads his daily SCRAM Device readings, the readings are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue. In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM Device by blocking the infrared system inside the Device, and consumed alcohol. But realistically speaking, the SCRAM Device cannot do both. If the SCRAM wearer is tampering with the SCRAM Device, then the SCRAM Device is unable to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

243.   The policies and procedures manifested by SSI and AMS, flat on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants SSI and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Matthew Brudnicki.

244.   Mr. Brudnicki had a constitutional right guaranteed to him by the United States Constitution, to know what the charges are against him, to be provided with exculpatory evidence that would help exonerate him and help defend against baseless charges perpetuated by SSI and AMS. Defendants SSI and AMS,

1  acting under the color of authority denied Mr. Brudnicki of his well-established

2  rights guaranteed to him. At all times relevant, both SSI and AMS are a person

3  within the meaning of 42 U.S.C. § 1983.

4      245.   As a proximate result of Defendants' unlawful conduct, Plaintiff has

5  suffered actual physical and emotional injuries, and other damages and losses as

6  described herein entitling him to compensatory and special damages, in amounts to

7  be determined at trial. As a further result of the Defendants' unlawful conduct, the

8  Plaintiff Matthew Brudnicki has incurred special damages and other special

9  damages related expenses, in amounts to be established at trial. Plaintiff is further

10  entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment

11  interest and costs as allowable by federal law.

12      246.   In addition to compensatory, economic, consequential and special

13  damages, Plaintiff Matthew Brudnicki is entitled to punitive damages against each

14  of the individually named Defendants under 42 U.S.C. § 1983, in that the actions

15  of each of these Defendants have been taken maliciously, willfully or with a

16  reckless or wanton disregard of the constitutional rights of the Plaintiff.

17      **9.**    ***James Roche v.  Court Programs, Inc. and Alcohol Monitoring***

18  ***Systems, Inc***

19      247.   Plaintiff James Roche, ("Mr. Roche or Plaintiffs") was convicted of a

20  DUI in the State of Florida and as an alternative to jail time, Mr. Roche was placed

21  on SCRAM monitoring for a period of no more than six months. In the time that

22  Mr. Roche was being monitored by Defendant Court Programs, Inc., ("CPI") and

23  Alcohol Monitoring Systems, Inc., ("AMS").

24      248.   Just weeks after being placed on SCRAM monitoring with CPI, the

25  Defendant immediately began accusing Mr. Roche of alcohol consumption. But at

26  no time did CPI or AMS ever provide Mr. Roche was any report, or evidence to

27  substantiate the false allegations assert by CPI.

28

1

2

3

    249.   Upon information and belief, CPI, AMS, and the County of Orange entered into a written contract at a time unknown to Mr. Roche, to provide ankle monitoring services to citizens for GPS and SCRAM monitoring.

4

5

6

7

8

9

10

11

12

    250.   While on SCRAM monitoring, Mr. Roche was required to pay the standard high end exuberant fee of $ 15.00 dollars per day for SCRAM monitoring and Mr. Roche began to ask CPI employees for a financial reduction sheet. But a CPI employee informed Mr. Roche that the CPI employees never heard of such a thing. Mr. Roche received numerous phone calls from CPI employee Justin Martin who was in charge of GPS and SCRAM monitoring for CPI informing Mr. Roche that he was behind in payments and would result in a violation and a report from AMS and CPI being sent to the Court. The CPI employee stated that he "would do anything necessary to collect."

13

14

15

16

    251.   In late 2010, Defendants CPI, AMS, and their employee Justin Martin accused Mr. Roche of consuming alcohol when in fact Mr. Roche had not. At various times, CPI employee Justin Martin pressured Mr. Roche into making his payments and to stop failing back, or "jail time would be best for you."

17

18

19

20

21

22

    252.   In that same time frame, CPI employee Justin Martin called Mr. Roche into the CPI office to have a discussion about alleged violations that Mr. Roche allegedly committed by consuming alcohol. Once Mr. Roche arrived at the CPI office, Mr. Roche demanded to see proof and documentation that Mr. Roche was in violation of his SCRAM conditions. However, when confronted with the questions, neither CPI, or Justin Martin had anything to say.

23

24

25

    253.   Defendants CPI and AMS at one point had a contract with the County of Orange in Orlando, Florida, however that was stripped away from CPI as a result of criminal actions on behalf of CPI and AMS.

26

27

28

254.   Defendants CPI and AMS were placed under investigation by several police agencies, private investigators, defense attorneys, and including a watch dog organization in Florida called CourtWatch. On several occasions, CPI and AMS violated numerous court orders signed by The Honorable Chief Judge Belvin Perry that she signed into effect when CPI and AMS initially had a government contract with the Orange County.  On other occasions, CPI was caught red handed not properly monitoring GPS and SCRAM clients. In fact, two known sex offenders were able to travel and contract the minor victims to terrorize them. CPI was not fully monitoring their clients.

255.   Additionally, the watch dog group CourtWatch discovered something else that was even more disturbing. In one instance, CPI was caught red handed lying and filing false violations reports against CPI clients. More specifically, CPI employee Justin Martin, stated above, filed caused false charges to be filed against one man. In 2012, CPI employee Justin Martin issued and filed with the Court an alleged violation report that CPI client Mr. Larry Duggan violated his monitoring conditions when in fact Mr. Duggan did not. A hearing was set in Court before the Honorable Rene Roche (no relation to Plaintiff) and Judge Roche determined that CPI employee Justin Martin lied, was found in comptempt of Court, and sent to jail.

256.   Accordingly, Judge Roche also determined that Mr. Duggan had only fallen behind in his payments to CPI totaling $ 1,250, and she further stated in her own words; "owing the company money is not a violation." Judge Roche also stated that CPI uses "scare tactics" to convince clients to pay fees to CPI and AMS. Defendant CPI later settled a lawsuit filed by Mr. Larry Duggan and his attorney Hank Hornsby. See also http://articles.orlandosentinel.com/2012-04-17/news/os-gps-court-programs-lawsuit-orange-20120417_1_gps-monitoring-gps-companies-gps-program.

257.   On January 3, 2011, Mr. Roche completed the SCRAM program and was formally removed from SCRAM monitoring, but Mr. Roche still remained on summary probation for his DUI conviction. Just weeks after Mr. Roche completed the SCRAM program, Mr. Roche began receiving phone calls from CPI employees informing him that there is an outstanding balance that is owed to CPI. Mr. Roche, ironically enough, was told that if he did not make a payment for the balance, that Mr. Roche would be charged with a SCRAM violation. Mr. Roche choose to not accept anymore phone calls from CPI.

258.   Less than two weeks later, Mr. Roche was sitting at home watching television when someone knocked on his door. It was none other than deputy sheriffs from the local Sheriff's Department, and also accompanied with them was none other than disgraced CPI employee Justin Martin as discussed above. Acting under the color of authority, in concert with, and on behalf of CPI, the deputies showed up to arrest Mr. Roche based on a violation report that Justin Martin signed and filed against Mr. Roche. As a result, CPI caused a warrant to be issued based off of an alleged SCRAM violation **after** Mr. Roche was terminated from SCRAM monitoring. Mr. Roche was arrested by CPI and local police, taken to the county jail where Mr. Roche was held with no bond.

259.   Because the facts will be heavily disputed, CPI and AMS alleged that at various times Mr. Roche consumed alcohol. At no time did CPI or AMS ever produce a copy of any alleged consumption reports. Instead of providing alleged consumption reports, both CPI and AMS altered some reports, and turned over that report to the Court, but not Mr. Roche, or his counsel.

260.   In fact, the report that was finally turned over was questioned by some as to whether or not the allegations were true. With weeks passing by, Mr. Roche was held in the county jail without bond. After spending six weeks in the county jail, Mr. Roche finally got to see a judge. What came next, was shocking to all.

261.   Mr. Roche was ordered to appear before the Honorable Renee Roche in the trial Court. Once before Judge Roche (again no relation), things began to surface. Judge Roche immediately called into question as to the validity of the alleged SCRAM report generated by AMS largely in part because all of the alleged dates and times that Mr. Roche was allegedly drinking, were not consistent with any other dates and times. In fact, Mr. Roche's attorney cross examined the CPI employee and Judge Roche found the witness as not reliable. Further, Judge Roche also determined that Mr. Roche was no longer on SCRAM monitoring. As a result of the actions of CPI and AMS, Mr. Roche sat in jail without bond for six weeks to only be found not guilty. Accordingly, Mr. Roche was released from custody, and went home.

262.   Had CPI and AMS turned over their alleged consumption violation report in a timely fashion as mandated by law, then Mr. Roche would have never been charged with a false and trumped up violation. Coincidentally, in the past three years, CPI has settled seven lawsuits mostly about violations of persons rights guaranteed by State and Federal law.

263.   Plaintiff James Roche believes, and thereon fully alleges that he was subjected to retaliation and false consumption reports for his failure to pay the monies that were outstanding to CPI and AMS.

264.   Mr. Roche believes, and thereon alleges that CPI and AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS, CPI, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that CPI and AMS alleges. Mr. Roche further alleges that CPI and AMS have entered

-67-

1  into a separate conspiracy among themselves to violate the established rights of the

2  people by concocting false reports to collect monies that are outstanding.

3      265.  Like all Plaintiffs in this case, each time Mr. Roche uploaded his daily

4  SCRAM Device readings, the readings are then transmitted from the SCRAM

5  Device, to a AMS' central facility in Littleton, Colorado where a minimum wage

6  employee with no training experience, no college certification, purportedly reads

7  the alleged consumption report and issues a determination whether or not the

8  SCRAM wearer consumed alcohol. Based on confidential information obtained by

9  a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives

10  the power and authority to this non-certified, minimum wage employee is allowed

11  to "pick and choose" which or what type of violation to issue. In some instances,

12  the AMS employee picks both that the SCRAM wearer tampered with the SCRAM

13  Device by blocking the infrared system inside the Device, and consumed alcohol.

14  But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

15  wearer is tampering with the SCRAM Device, then the SCRAM Device is unable

16  to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

17      266.  The policies and procedures manifested by CPI and AMS, flat on its

18  face and as applied, or threatened to be applied, violates the Right to Petition and

19  the Equal Protection Clause of the Fourteenth Amendment to the United States

20  Constitution and similar guarantees in the Constitution by denying Plaintiff free

21  speech rights, and the right to petition the Court, and to others in similar situations

22  and other protections of state and federal law. The Defendants CPI and AMS to

23  this claim at all times relevant hereto were acting pursuant to a custom, policy,

24  decision, ordinance, regulation, widespread habit, usage, or practice in their actions

25  pertaining to Plaintiff James Roche.

26

27

28

277.   Mr. Roche had a constitutional right guaranteed to him by the United States Constitution, to know what the charges are against him, to be provided with exculpatory evidence that would help exonerate him and help defend against baseless charges perpetuated by CPI and AMS. Defendants CPI and AMS, acting under the color of authority denied Mr. Roche of his well-established rights guaranteed to him. At all times relevant, both CPI and AMS are persons within the meaning of 42 U.S.C. § 1983.

288.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff James Roche has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.  Additionally, Mr. Roche lost his job as a result of being incarcerated where by all accounts Mr. Roche would have made well over a $ 100,000 a year.

290.   In addition to compensatory, economic, consequential and special damages, Plaintiff James Roche is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

### 10.    *Jennifer Johnston v. Alcohol Monitoring Systems, Inc.*

291.   Plaintiff Jennifer Johnston, ("Ms. Johnson or Plaintiffs"), was going through a child custody matter with her ex-husband, and Ms. Johnston was seeking child custody of her children. During the course of the litigation in family Court, the Court ordered Ms. Johnston to enroll in the SCRAM ankle monitoring program through the Johnson County Department of Corrections, JCDC, and to abstain

1   from the use of alcohol.

2   292.   After the Court issued the order to enroll in the SCRAM program, Ms.

3   Johnston enrolled the very next day. Once Ms. Johnston reported and enrolled, the

4   JCDC employees provided her with a list of environmental products not to use that

5   was issued exclusively from AMS. As a requirement of being on the SCRAM

6   Device, MS. Johnston was also required to pay the JCDC money for the AMS

7   SCRAM Device. Defendant AMS, acting under the color of authority then sends

8   the JCDC an invoice for those funds, then in turn, the JCDC remits the payment to

9   AMS by sending AMS funds from Kansas to their corporate headquarters located

10   in

11   293.   During the family law proceedings, Defendant AMS alleged that Ms.

12   Johnston consumed alcohol and that she was in violation of a court order. At no

13   time did AMS ever inform the JCDC, Ms. Johnston, or her attorney. In fact, AMS

14   instead sent the report directly to the Court that was overseeing the family law case

15   of concerning Ms. Johnston. Acting under the color of authority, AMS sent an

16   alleged violation report directly with the Court, and an AMS employee spoke to

17   the Court staff trying to obtain a bench warrant for Ms. Johnston's arrest.

18   294.   However, AMS was never aware that her case was a civil case, not a

19   DUI criminal case. Ms. Johnston was unable to pay for the SCRAM monitoring, so

20   AMS knew they had to act quickly and try to have Ms. Johnston arrested by

21   indicating that she violated a Court order and issue a false report reflecting same.

22   295.   With several weeks passing, Ms. Johnston was only informed by her

23   attorney that she violated the conditions of a Court order. However, AMS never

24   sent Mr. Johnston, nor her attorney a copy of the violation report.

25   296.   On several occasions, Ms. Johnston's attorney contacted AMS to try

26   and locate the AMS report. With Ms. Johnston facing the possibility of losing her

27   chance to get joint custody of her children, Ms. Johnston wanted to prove to the

28   Court that she did not consume alcohol as AMS persisted.

297.   As a direct result of AMS not turning over the alleged consumption report, Ms. Johnston paid over $ 1,500 dollars to her attorney to try and get ahold of the reports from AMS. However, AMS refused to turn over the report denying Ms. Johnston her constitutional and civil rights to petition the Court to seek blood, ETG, or some other form of alcohol testing. But Ms. Johnston was denied her rights by AMS, acting under the color of authority.

298.   In early 2013, the Johnson County Department of Corrections entered into a written contract with AMS to exclusively provide SCRAM monitoring to offenders that are charged with DUI matters, as well as offenders on probation and parole. In turn, AMS receives a yearly payment of $ 380,000 plus dollars from the JCDC for their alcohol monitoring service.

299.   The policies and procedures manifested by AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendant AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Jennifer Johnston.

300.   Like all Plaintiffs in this case, each time Ms. Johnston uploads her daily SCRAM readings, the readings are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed

1  to "pick and choose" which or what type of violation to issue. In some instances,

2  the AMS employee picks both that the SCRAM wearer tampered with the SCRAM

3  Device by blocking the infrared system inside the Device, and consumed alcohol.

4  But realistically speaking, the SCRAM Device cannot do both. If the SCRAM

5  wearer is tampering with the SCRAM Device, then the SCRAM Device is unable

6  to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

7  301.   As a proximate result of Defendants' unlawful conduct, Plaintiff has

8  suffered actual physical and emotional injuries, and other damages and losses as

9  described herein entitling him to compensatory and special damages, in amounts to

10  be determined at trial. As a further result of the Defendants' unlawful conduct, the

11  Plaintiff Jennifer Johnston has incurred special damages and other special damages

12  related expenses, in amounts to be established at trial. Plaintiff is further entitled to

13  attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and

14  costs as allowable by federal law.

15  302.   In addition to compensatory, economic, consequential and special

16  damages, Plaintiff Jennifer Johnston and members of the is entitled to punitive

17  damages against each of the individually named Defendants under 42 U.S.C. §

18  1983, in that the actions of each of these Defendants have been taken maliciously,

19  willfully or with a reckless or wanton disregard of the constitutional rights of the

20  Plaintiff.

21  ***11.    Michael Spano v. Rocky Mountain Offender Management Systems,***

22  ***LLC and Alcohol Monitoring Systems, Inc.***

23  303.   Plaintiff Michael Spano, ("Mr. Spano or Plaintiffs") on March 17,

24  2016, on St. Patrick's Day, Mr. Spano was driving through the City of New York

25  where he resides. At some point while driving, Mr. Spano made a wrong U-turn

26  and was subsequently pulled over by police for a traffic violation. Police officers

27  of the New York Police Department, NYPD, asked MR. Spano if he had consumed

28  alcohol that day.  Mr. Spano informed the NYPD officers that he had four beers in

1  the past four hours. After a series of FST's, Mr. Spano was placed under arrest by
2  the NYPD officers.

3  304.   Mr. Spano was then taken to the police station where has was booked
4  on suspicion of DUI. After several hours at the police station, Mr. Spano was then
5  released on his own recognizance. Mr. Spano was given a Court date to appear in
6  the Superior Court of New York. Several weeks later, Mr. Spano retained private
7  counsel, the law office of Dominick Gullo.

8  305.   On July 12, 2016, Mr. Spano and his counsel appeared in the trial
9  Court and entered a not guilty plea. During the hearing, the trial Court instructed
10  Mr. Spano not to use alcohol and to report to Defendant Rocky Mountain Offender
11  Management Systems, RMOMS, within 24 hours, after his Court appearance.

12  306.   The following day, Mr. Spano enrolled in the SCRAM program with
13  RMOMS and paid the Defendant a large setup fee to have the service established.
14  Further, a RMOMS employee provided Mr. Spano with a list of environmental
15  products not to use while on SCRAM monitoring. The list of products is produced
16  by RMOMS co-Defendant AMS and then sent to RMOMS.

17  307.   Several days later, Mr. Spano began complaining about the fees to the
18  RMOMS case manager. As such, Mr. Spano was forced to pay $ 100.00 a week for
19  the RMOMS service. One case manager informed Mr. Spano that RMOMS and
20  AMS has the ability to petition the Court and have a report generated reflecting
21  that Mr. Spano is in violation of his RMOMS conditions pertaining to his release.
22  Additionally, the RMOMS employee began bragging about how RMOMS and its
23  employees "just secured a three-year prison sentence for one jerk who didn't pay
24  us."

25  308.   On September 4, 2016, Defendant RMOMS, with the assistance of
26  their co-Defendant AMS, the Defendants created a false report indicating that Mr.
27  Spano removed the SCRAM Device for a period of four days. However, this would
28  not become known to Mr. Spano until a month later when Mr. Spano appeared in

1   Court with his attorney. Mr. Spano had just reported days prior to RMOMS and

2   had the SCRAM Device.

3       309.   While in Court, Mr. Spano was informed for the very first time that

4   Mr. Spano allegedly removed the SCRAM Device. Just two days prior to the Court

5   appearance, an employee of RMOMS telephoned Mr. Spano complaining about

6   past due balances that were due to RMOMS and AMS. Mr. Spano was informed

7   that the Court would be notified if RMOMS and AMS was not paid "right now."

8       310.   Mr. Spano informed RMOMS that he did not have any more money to

9   pay RMOMS, and that Mr. Spano had to make a payment to his criminal defense

10   attorney. The RMOMS replied; "that's not our concern."

11       311.   In Court, Mr. Spano and his attorney were never made aware of any

12   alleged tamper with the SCRAM Device. Almost a month went by before Mr.

13   Spano was ever informed of the alleged tamper after he completed the SCRAM

14   program.

15       312.   On or about Sept 4th, 2016, Defendant AMS transmitted a tamper

16   report concerning Mr. Spano to RMOMS reflecting that Mr. Spano removed the

17   SCRAM Device. However, this was not true. Had Mr. Spano removed the

18   SCRAM Device, an electronic signal would have been sent to AMS and RMOMS

19   immediately and Mr. Spano would have been notified. Mr. Spano was told he then

20   put the bracelet back on 4 days later. This was completely false. He was unaware

21   of this and not notified till almost a month later.

22       313.   On July 23rd, 2009, the City of New York, and various counties in

23   New York entered into a written contract with RMOMS and AMS to provide

24   various offenders in the New York City area with SCRAM ankle monitoring. In

25   turn, the City and counties pay RMOMS and AMS hundreds of thousands of

26   dollars per year for SCRAM ankle monitoring. Additionally, the county is which

27   Mr. Spano was being supervised by RMOMS, currently advertises RMOMS and

28   AMS on their official website as an "effective tool" against alcohol abuse.

314.   Plaintiff believes, and thereon alleges, that RMOMS and AMS were poised to get back at Mr. Spano for his failure to pay RMOMS and AMS as they demanded of him. As such, Plaintiffs believes that this was the basis for the alleged violation. The policies and procedures manifested by RMOMS and AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants RMOMS and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Michael Spano.

315.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Michael Spano has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

316.   In addition to compensatory, economic, consequential and special damages, Plaintiff Mike Spano is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**12.    *Toriahna Bonds v. House Arrest Services, Inc. and Alcohol Monitoring Systems, Inc.***

317.   Plaintiff Torianna Bonds, ("Ms. Bond or Plaintiffs") in late 2014, was placed on SCRAM monitoring, and ordered to enroll and report to House Arrest Services, Inc., ("HAS"), to be placed on SCRAM monitoring for a period of no more than 60 days.

318.   Shortly after being placed in SCRAM with HAS, Mr. Bonds, HAS immediately began accusing Ms. Bonds of both tampering with the SCRAM Device, as well as consumption. In these allegations, they are even harder to piece together due to numerous inconsistencies in all of the reports generated and reviewed by AMS, then transmitted to HAS.

319.   On or about November 11, 2015, HAS generated a letter concerning Ms. Bonds indicating, among other things, that Ms. Bonds tampered and tried to obstruct the SCRAM Device. The letter also stated that alcohol was detected from the date of the incident of November 8, 2015. And that the obstruction was removed at 1:07 am on November 9, 2015.

320.   Upon information and belief, Ms. Bonds alleges that this letter authored by HAS was sent to the probation department, as well as the Court. Most shocking, the HAS and AMS letter then went on to say; **"This event has been confirmed by both the manufacture and House Arrest Services as an obstruction and consumption." [emphasis in original].**

321.   On December 10, 2015, Ms. Bonds was ordered to report back to the trial Court due to facts that Ms. Bonds probation and her 60 SCRAM monitoring were set to expire. Once Ms. Bonds and her attorney appeared before the trial Court, Ms. Bonds was also informed for the very first time that Ms. Bonds has a petition to revoke her probation filed against her by HAS and AMS for alleged violations of tampering and consumption while on the SCRAM monitor. As a complete surprise to Ms. Bonds and her private counsel, everyone was caught off

-76-

guard based entirely due to HAS and AMS making these allegations almost two months later after the alleged tamper and consumption. At the hearing, Ms. Bonds' attorney adamantly requested all copies of all reports from HAS and AMS. That day Ms. Bonds counsel served a subpoena for all records upon HAS and AMS.

322.   That same day at the Court hearing, the Court continued the hearing to give each side an opportunity to obtain the reports and records from HAS. On several occasions, Ms. Bonds attorney contacted HAS several times for the copies of the records as stated in the subpoena. However, HAS completely ignored her attorney, and hung up the telephone every time that Ms. Bonds telephoned HAS to obtain the reports. The next hearing was slated for December 17, 2015.

323.   On December 16, 2015, after numerous complaints to HAS for their lack of turning over all violation reports concerning Ms. Bonds, HAS and AMS finally turned over the violation reports literally just hours before the hearing. On this date at 11:05 pm, late at night, HAS transmitted the reports to Ms. Bonds' attorney for review. However, her attorney was not provided enough time to review the reports, obtain witnesses for her client, or even find an expert to review and interpret the reports generated by AMS, transmitted by HAS.

324.   Further, once the reports were finally turned over, and in the little to almost no time Ms. Bonds' counsel had to review the report, and prepare for a proper defense for her client, Ms. Bonds' attorney almost immediately noticed several inconsistencies in the reports. Again, in the letter mentioned above, the letter from HAS to the Court, it clearly states **"This event has been confirmed by both the manufacture and House Arrest Services as an obstruction and consumption." [emphasis in original].**

325.   This was very puzzling for Ms. Bonds' attorney because in one report that was turned over to Ms. Bonds' attorney, the report states that Ms. Bonds tampered with the SCRAM Device on the alleged date above. But what's different in this report pertaining to the same date, this report states; **"The SCRAM system**

**detected no alcohol consumption events and 1 tamper events for the reporting period of November 8, 2015." [emphasis in original].**

326.   Defendants HAS and AMS owed an affirmative duty to Ms. Bonds' and her attorney to turn over all copies of the reports in a timely manner.

327.   Defendants HAS and AMS failed and refused to do so, thereby denying Ms. Bonds' of constitutional civil rights.

328.   Coincidentally, the business owner of HAS, Mr. Carlo Ugval who is the president and CEO of HAS, was seen a few years ago attending a steak dinner and drinks at a local hotel. While attending the event, Mr. Ugval is seen in several photos obtained by the Plaintiffs, with the very same Superior Court Judges in Oakland County who are directly responsible for placing criminal defendants on the SCRAM monitoring. Ironically enough, Mr. Ugval is also seen in various photos with Oakland County Judges Peter Maceroni, Richard Hathaway, and Richard Carett on vacation of Mr. Ugval's boat.

329.   On or about June 6, 2008, HAS entered into a government contract with Oakland County, Michigan to provide Defendants with SCRAM ankle monitoring to individuals facing some type of criminal charges. In this government contract, Defendant HAS, acting under the color of authority, signed and executed a written contract stating that HAS will receive $ 3,000,000.00 annually exchange for providing SCRAM monitoring. Upon information and belief, 25% percent of that amount goes back to AMS in Littleton, Colorado, whereas HAS must pay for the actual SCRAM equipment. In this written contract, it was signed by Jack sato, Oakland County purchasing manager, and also signed by John Cooperrider, account manager for HAS.

330.   Like all Plaintiffs in this case, each time Ms. Bonds uploads her daily SCRAM readings with HAS, then in turn the readings are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification,

1   purportedly reads the alleged consumption report and issues a determination

2   whether or not the SCRAM wearer consumed alcohol. Based on confidential

3   information obtained by a reliable source, a former AMS employee, informed the

4   Plaintiffs that AMS gives the power and authority to this non-certified, minimum

5   wage employee is allowed to "pick and choose" which or what type of violation to

6   issue. In some instances, the AMS employee picks both that the SCRAM wearer

7   tampered with the SCRAM Device by blocking the infrared system inside the

8   Device, and consumed alcohol. But realistically speaking, the SCRAM Device

9   cannot do both. If the SCRAM wearer is tampering with the SCRAM Device, then

10   the SCRAM Device is unable to reach out and obtain sweat levels to send back to

11   AMS' facility in Colorado.

12       331.   The policies and procedures manifested by HAS and AMS, on its face

13   and as applied, or threatened to be applied, violates the Right to Petition and the

14   Equal Protection Clause of the Fourteenth Amendment to the United States

15   Constitution and similar guarantees in the Constitution by denying Plaintiff free

16   speech rights, and the right to petition the Court, and to others in similar situations

17   and other protections of state and federal law. Defendants HAS and AMS to this

18   claim at all times relevant hereto were acting pursuant to a custom, policy,

19   decision, ordinance, regulation, widespread habit, usage, or practice in their actions

20   pertaining to Plaintiff Torianna Bonds.

21       332.   As a proximate result of Defendants' unlawful conduct, Plaintiff has

22   suffered actual physical and emotional injuries, and other damages and losses as

23   described herein entitling her to compensatory and special damages, in amounts to

24   be determined at trial. As a further result of the Defendants' unlawful conduct, the

25   Plaintiff Toriana Bonds has incurred special damages and other special damages

26   related expenses, in amounts to be established at trial. Plaintiff is further entitled to

27   attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and

28   costs as allowable by federal law.

333.   In addition to compensatory, economic, consequential and special damages, Plaintiff Torianna Bonds is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**13.   *Dakota Jones v. Scram of California, Inc. and Alcohol Monitoring Systems, Inc.***

334.   Plaintiff Dakota Jones, ("Mr. Jones or Plaintiffs") was pulled over in 2015 in San Luis Obispo County for suspicion of DUI. After being pulled over, deputies from the nearby Sheriff's Department placed Mr. Jones under arrest for the suspicion of DUI. Mr. Jones was transported to the county jail where Mr. Jones posted a bail bond. After his release, Mr. Jones appeared in the San Luis Obispo County Superior Court and entered a guilty plea to the DUI charge. Mr. Jones was placed probation. Shortly after being placed on probation, Mr. Jones decided to transfer his probation to San Diego County. Once transferred to San Diego, Mr. Jones sustained a probation violation, and the trial Court wanted to impose a state prison sentence on Mr. Jones. However, Mr. Jones retained private counsel, and Mr. Jones' attorney was able to secure Mr. Jones a plea agreement that would require that Mr. Jones enroll in the SCRAM monitoring for six months, and follow all conditions of probation. Mr. Jones agreed, and was ordered released from the county jail on December 2, 2016, and was ordered to appear at the SCRAM office in San Diego and enroll with Scram of California, Inc., ("SCRAM").

335.   On December 5, 2016, Mr. Jones appeared at the SCRAM office to have a SCRAM Device attached to his leg. Mr. Jones was also required to pay the usual outrageous "set-up fee" in the amount of $ 325.00. Mr. Jones was also told by a SCRAM employee that Mr. Jones must make a payment every two-weeks in the amount of $ 225.00 directly to SCRAM, and Mr. Jones was further instructed that if Mr. Jones did not make the payments on time, or altogether, that Mr. Jones

would "go right back to jail."

336.   Once fitted with the SCRAM Device, Mr. Jones was provided a piece of paper with a list of environmental products not to use.  Almost a week and a half later, Mr. Jones fell back on his SCRAM payments. Employees at SCRAM on a daily basis contacted Mr. Jones for the payments.

337.   Several weeks later, SCRAM had enough with Mr. Jones. Now for the very first time, SCRAM decided to allege that Mr. Jones was in violation of his SCRAM conditions. SCRAM and the manufacture of the SCRAM Device, AMS indicated to Mr. Jones that he consumed alcohol "somewhere between" December 14, 2016 and December 17, 2017. However, SCRAM and their subsidiary corporation AMS, did not notify Mr. Jones until December 23, 2016, that Mr. Jones allegedly violated his SCRAM conditions. In fact, SCRAM and AMS were unable to provide Mr. Jones with a copy of any alleged report. This was none other than a dirty "scare tactic" often deployed by SCRAM in collect outstanding monies.

338.   As a result of the SCRAM and AMS not turning over the alleged violation reports in a timely fashion, Mr. Jones was forced to pay additional attorney fees to his attorney of record to spend hours trying to get copies of the records that Mr. Jones is clearly entitled to. Through this lawsuit, Mr. Jones is only challenge the policies and procedures of SCRAM and AMS.

339.   Sometime in 2012, Defendant SCRAM entered into a written contract with the Superior Court of California, and the State of California. That contract went into effect immediately so that SCRAM and AMS could provide SCRAM ankle monitoring services to various offenders in the State of California. As such, acting under the color of authority, SCRAM received a contract account number 4400011840. As a part of the written contract, the Superior Court of California paid SCRAM and their subsidiary corporation $ 36,116 payable to SCRAM. This contract was signed into effect by SCRAM president Aaron Fleisher and members

-81-

of the Judicial Council of California. In return, SCRAM will provide ankle monitor service from SCRAM, and all reports will come directly from their co-Defendant AMS.

340.    The policies and procedures manifested by SCRAM and AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. Defendants SCRAM and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Dakota Jones.

341.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Dakota Jones has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

342.    In addition to compensatory, economic, consequential and special damages, Plaintiff Dakota Jones is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

*14.     Dan McCullough v. ProntoTrak, Inc. and Alcohol Monitoring Systems, Inc.*

343.    Plaintiff Dan McCollough, ("Mr. McCollough or Plaintiffs") was on the night of June 14, 2012, pulled over by police in Georgia. Police suspected that Mr. McCollough was driving while intoxicated. Police asked Mr. McCollough to perform a series of tests to determine whether or not Mr. McCollough was driving under the influence. Mr. McCollough was arrested on suspicion of driving while intoxicated.

344.    Mr. McCollough was taken to the local jail and booked on a criminal DUI charge and later released. When Mr. McCollough appeared in the trial Court, Mr. McCollough was required to enroll in the SCRAM ankle monitoring program with Defendant ProntoTrak, Inc., ("PRONTO"), and pay a high end exuberant fee of $ 300.00 "set-up" to PRONTO.

345.    On July 19, 2013, Mr. McCollough enrolled in the SCRAM program and was provided with a list of environmental products published by AMS not to use while on SCRAM monitoring.  Defendant PRONTO and AMS advertises to City, County, State, and Federal law enforcement agencies that the SCRAM Device can tell the difference between actual alcohol consumption, and a person coming into contact with household items that have alcohol ingredients. Both AMS and PRONTO knew that these statements are false. Because the SCRAM Device is not specific enough to test for ethanol, there is no way the SCRAM Device can do what AMS and PRONTO says.

346.    Several months on SCRAM monitoring, PRONTO and AMS alleged that Mr. McCollough consumed alcohol on the days of November 5, 2013, all the way to November 9, 2013. Both PRONTO and AMS claim that for 108 hours straight, that Mr. McCollough consumed alcohol. A clear biological impossibility.

347.   However, Mr. McCollough was never informed about the alleged violation until almost four months later. On November 14, 2013, Mr. McCollough appeared at the PRONTO office to make a payment to PRONTO. Once the money was paid to PRONTO, Mr. McCollough was then told that he had an active bench warrant for his arrest, and that Mr. McCollough missed not one, but two payments to PRONTO. The PRONTO employee, Craig Gant then went on to say that he personally obtained the warrant and had the Judge sign the warrant. Based on the information conveyed to Mr. McCollough, Mr. Gant instructed Mr. McCollough to stand up and put his hands behind his back. Acting under the color of state law, Mr. McCollough was detained by PRONTO and Mr. Gant.

348.   Several years ago, preceding this lawsuit, at least three different states in the United States granted official police powers to PRONTO, and also gave them official police powers, collect money on behalf of the various states, and impose conditions of probation on the SCRAM client.

349.   PRONTO employee Mr. Gant then handcuffed Mr. McCollough, told him he was "being detained" and Mr. Gant then telephoned the police. Minutes later, deputies from the Cherokee County Sheriff's Department, ("CCSD") arrived at the office of PRONTO. Mr. Gant then led the deputies in to a "holding cell" in the rear of the office where Mr. McCollough was handcuffed and waiting. Mr. Gant them read Mr. McCollough his Miranda rights, and Mr. Gant escorted Mr. McCollough out of the office and was permitted to place Mr. McCollough in the back seat of the police car.  Acting under the color of authority, Mr. Gant then handed the deputies all of Mr. McCollough's personal belongings that PRONTO and Mr. Gant confiscated from Mr. McCollough after handcuffing him.

340.   At all times relevant, Mr. McCollough had a constitutional right guaranteed to him to know the charges filed against him in a timely manner, and to have copies of reports so that Mr. McCollough can prove his innocence in a timely manner.

341.   Mr. McCollough believes, and thereon alleges that PRONTO and AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS and PRONTO, and other third party alcohol providers can paint a picture of the SCRAM client that he or she is guilty in the eyes of the government agencies, and that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the said SCRAM Device, and that the SCRAM customer is guilty of anything and everything that PRONTO and AMS alleges.

342.   Mr. McCollough further alleges that PRONTO and AMS have entered into a separate conspiracy among themselves to violate the established rights of the people by concocting false reports to collect monies that are outstanding.

343.   Like all Plaintiffs in this case, each time Mr. McCollough uploaded his daily SCRAM Device readings, the readings are then transmitted from the SCRAM Device docking station, to AMS' central facility in Littleton, Colorado where a minimum wage AMS employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue in the AMS report.

344.   The policies and procedures manifested by PRONTO and AMS, flat on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. The Defendants PRONTO and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy,

1    decision, ordinance, regulation, widespread habit, usage, or practice in their actions

2    pertaining to Plaintiff Dan McCollough.

3        345.   Mr. McCollough had a constitutional right guaranteed to him by the

4    United States Constitution, to know what the charges are against him, to be

5    provided with exculpatory evidence that would help exonerate him and help defend

6    against baseless charges perpetuated by PRONTO and AMS. PRONTO and AMS,

7    acting under the color of authority denied Mr. McCollough of his well-established

8    rights guaranteed to him. At all times relevant, PRONTO and AMS are persons

9    within the meaning of 42 U.S.C. § 1983.

10        346.   As a proximate result of Defendants' unlawful conduct, Plaintiff has

11    suffered actual physical and emotional injuries, and other damages and losses as

12    described herein entitling him to compensatory and special damages, in amounts to

13    be determined at trial. As a further result of the Defendants' unlawful conduct, the

14    Plaintiff Dan McCollough has incurred special damages and other special damages

15    related expenses, in amounts to be established at trial. Plaintiff is further entitled to

16    attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and

17    costs as allowable by federal law.

18        ***15.   Dusty Derigo v. Total Court Services of Indiana, LLC and Alcohol***

19    ***Monitoring Systems, Inc.***

20        347.   Plaintiff Dusty Derigo, ("Mr. Derigo or Plaintiffs") was on the night

21    of May 4, 2012, pulled over by police in the State of Indiana for suspicion of DUI

22    while operating a motor vehicle. Mr. Derigo was given a series of field sobriety

23    tests. However, Mr. Derigo failed those tests and was placed under arrest by police.

24        348.   Several weeks after being arrested for allegation of DUI, Mr. Derigo

25    retained private counsel and appeared in Court. The trial Court permitted Mr.

26    Derigo to remain on his own recognizance. Also at the hearing, the trial Court

27    ordered Mr. Derigo to enroll in the SCRAM program with a local agency. At a

28    later time, that agency was shut down due to lack of funding. With no other choice,

-86-

Mr. Derigo had to re-enroll in the SCRAM program by contacting Defendant Total Court Services of Indiana, LLC., ("TCSI").

349.   After Mr. Derigo enrolled in the SCRAM program with TCSI, the staff at TCSI began demanding payments from Mr. Derigo to be paid on a weekly basis to TCSI.

350.   After Mr. Derigo complained to the employees at TCSI, Mr. Derigo was told that if he "keeps it up, you will be violated." On various dates and times, Mr. Derigo complained to TCSI staff that the SCRAM Device was too tight. TCSI employees told Mr. Derigo to "just deal with it."

351.   On May 4, 2014, just two days after missing a payment to TCSI, and filing two mores complaints with TCSI, both TCSI and AMS alleged that Mr. Derigo consumed alcohol for 12 hours starting at 1:00pm in the afternoon.  What came as no surprise, TCSI never informed Mr. Derigo about the alleged violation until two weeks later. TCSI alleged that AMS produced a report stating that on the above date and time, Mr. Derigo consumed alcohol. Mr. Derigo demanded copies of the alleged report from TCSI, but they refused.

352.   Upon information and belief, Mr. Derigo believes and thereon alleges that Defendants TCSI and AMS entered into written contracts with the State of Indiana, and various counties throughout the State. More specifically, Mr. Derigo believes it was that of AMS that helped TCSI secure government contracts, or in the alternative, TCSI and AMS have partnered to obtain government contracts.

353.   On several occasions, Mr. Derigo and his attorney requested copies of all reports, however TCSI and AMS refused to turn over those reports to Mr. Derigo and his counsel.

354.   At all times relevant, both TCSI and AMS were acting under the color of authority, and in concert with government officials, and denied Mr. Derigo his constitutional and civil rights.

355.   Mr. Derigo believes, and thereon alleges that AMS have an ongoing established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that AMS can paint a picture of themselves in the eyes of the government that the equipment of AMS actually works, and that the SCRAM wearer consumed alcohol while on the SCRAM Device, and that the SCRAM customer is guilty of anything and everything that AMS alleges. Without more, it would cost AMS a multimillion dollar contract. Therefore, AMS must protect their assets in a contract like this.

356.   The policies and procedures manifested by TCSI and AMS, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights, and the right to petition the Court, and to others in similar situations and other protections of state and federal law. Both TCSI and AMS to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Dusty Derigo.

357.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Dusty Derigo has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

358.   In addition to compensatory, economic, consequential and special damages, Plaintiff Dusty Derigo, and members of the class are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

### 16.   Angel Gonzales v. Scram of California and Alcohol Monitoring Systems, Inc.

359.   Plaintiff Angel Gonzales, ("Mr. Gonzalez or Plaintiffs"), was driving in the City of Otay Mesa, California, on May 24th, 2017, when a small traffic accident had occurred. After the car accident had occurred, police officers of the San Diego Police Department, SDPD, arrived on scene and began assessing the parties involved in the traffic accident. After several minutes on scene, SDPD officers began interviewing the drivers of each of the vehicles involved. Once SDPD officers interviewed each of the drivers, SDPD officers began to suspect that Mr. Gonzalez was driving under the influence of an alcoholic beverage. After SDPD officers had a conversation with Mr. Gonzales, he admitted to having only two drinks.

360.   After Mr. Gonzales admitted to having two drinks, SDPD decided to conduct field sobriety tests, FST's, to officially determine if Mr. Gonzalez was under the influence. After failing the FST's, officers then proceeded to conduct a preliminary assessment screening, PAS, where Mr. Gonzalez was required to blow into a small hand-held device used by law enforcement. After blowing into the PAS, officers determined that Mr. Gonzales under the influence, and not legally permitted to operate a motor vehicle. As such, SDPD officers placed Mr. Gonzales under the influence of alcohol. Mr. Gonzales was later transferred to the San Diego County Jail, SDCJ, where he was booked on a $ 25,000 bail bond.

361.   Mr. Gonzales was later released from the SDCJ after his wife posted a bail bond to secure his release. Mr. Gonzales quickly moved to retain a private attorney to defend against the allegations.

362.   Almost two months later, Mr. Gonzales and his retained counsel then appeared in the San Diego Superior Court to defend against the allegations. At the Court hearing, the Court order Mr. Gonzales to enroll in the SCRAM program with Defendant Scram of California, Inc. ("SCRAM"). The Court further ordered that Mr. Gonzales refrain from using or consuming alcohol.

363.   On July 7th, 2017, Mr. Gonzales obeyed the order of the Court and went and enrolled in the SCRAM program with SCRAM located at their office in San Diego. Once Mr. Gonzales arrived at the SCRAM office, the employees had Mr. Gonzales watch a quick video on how to properly use the SCRAM Device, and the SCRAM employees immediately began asking Mr. Gonzales very intense questions about his financial background. The SCRAM employees then instructed Mr. Gonzales to fill out a form that asks him questions about his monthly income, how much money he had in his bank account, and how much money Mr. Gonzales had on his person "right now."

364.   Mr. Gonzales filled out the form to the best of his knowledge and provided the form back to his case manager Pedro Estrada. Mr. Estrada then placed the SCRAM Device on Mr. Gonzales leg, and provided Mr. Gonzales with a docking station, a small magnet, and a base charger. Thereafter, his case manager then began demanding $ 460.00 from Mr. Gonzales.

365.   Prior to reporting to SCRAM to enroll in the SCRAM program, Mr. Gonzales was only informed to bring $ 200.00 to the SCRAM office and that would be the cost for the first payment, plus enrollment. However, this was not the case. In fact, only when Mr. Gonzales began to complain to his case manager about the high SCRAM fees, the case manager Pedro Estrada began yelling and screaming at Mr. Gonzales and stated; "do you want to go back to jail, and eat

-90-

1   more bologna sandwiches?"

2   366.   Facing a credible threat of being returned to jail, Mr. Gonzales then

3   had no choice in the matter. He was forced to pay SCRAM a total of $ 480.00

4   dollars that day. This did not include the first, or second weeks monitoring fees.

5   Mr. Gonzales paid the high fees, and the case manager stated; "that's better."

6   367.   The following day, Mr. Gonzales complained to the SCRAM

7   supervisor Sarah Lebov about the fees, and Ms. Lebov did not to help lower the

8   costs for Mr. Gonzales.

9   368.   On July 9th, 2017, just two days after having the SCRAM Device

10  installed, Defendant SCRAM OF CALIFORNIA stated in a written report from

11  Defendant AMS that Mr. Gonzales consumed alcohol and that his alcohol level

12  was a .03 TAC level, which is equal and no greater than half a drink.

13  369.   Once the report was generated, at no time did SCRAM and/or AMS

14  ever inform Mr. Gonzales of the alleged consumption violation. In fact, this same

15  day, Mr. Gonzales had a telephone conversation with his case manager, and at no

16  time did Mr. Estrada inform Mr. Gonzales that he was allegedly in violation of his

17  SCRAM conditions. During this conversation, Mr. Gonzales inquired if Mr.

18  Gonzales could travel to Mexico for vacation and to see family and friends. The

19  case manager informed Mr. Gonzales that he was free to travel back and forth from

20  the United States to Mexico. Mr. Gonzales properly informed his case manager

21  that he was going to travel to Mexico. In that same phone call, Mr. Estrada began

22  asking as to when SCRAM could be expecting the bi-weekly payment while he

23  was on vacation. Mr. Gonzales stated he was going to Mexico for only a few days.

24  370.   Almost two weeks later while Mr. Gonzales was returning through the

25  Port of Entry from Mexico, Mr. Gonzales was stopped and questioned by agents of

26  the United States Customs Border Protection, CBP, and informed Mr. Gonzales

27  that he had a bench warrant for his arrest. Thereafter, CBP agents arrested him and

28  called the SDPD who then transported Mr. Gonzales to the SDCJ.

371.   On July 9th, 2017. Defendant SCRAM received a report from their co-Defendant, and the manufacture of the SCRAM Device. However, Defendants SCRAM and AMS, acting under the color of law, and in concert with one another, sent a copy of the report to the Superior Court of California without first notifying Mr. Gonzales' attorney. Defendants SCRAM and AMS only sent a copy to the Court whereby committing an ***illegal ex parte*** communication. As a part of the written contract between the Superior Court and the State of California signed by both the State and SCRAM, Defendant SCRAM is granted a special privilege to be able to send reports to the Court without first notifying the defense attorney or the attorneys client.

372.   Almost a month went by before SCRAM informed Mr. Gonzales that he was allegedly in violation of his bond conditions. Plaintiff believes and thereon alleges that when an alleged consumption report is generated, the report is then sent to AMS in Littleton, Colorado at AMS' headquarters where a minimum wage employee with no training or education reads a graph to somehow come to a final conclusion that Mr. Gonzales, and the members of the class, allegedly consumed alcohol. After making some form of determination, Defendant AMS then transmits that report to SCRAM who also reviews the alleged report and graph to determine if the SCRAM client has committed a violation.

373.   Acting under the color of state law, SCRAM then contacts the trial Court Judge and sends the report directly to the Judge. SCRAM then causes the SCRAM client to have a warrant issued. This was the case here. Due to the flawed report generated by AMS, transmitted to SCRAM, then sent to the Court, the trial Court then issued a bench warrant for the arrest of Mr. Gonzales.

374.   Due to the fact that Mr. Gonzales was never informed by SCRAM and AMS about an alleged drinking episode in a timely manner, Mr. Gonzales had no opportunity to go and have his been drawn to prove he did not consume alcohol.

375.   Instead, due to the long-standing policy, practice and/or custom by SCRAM and AMS, the Defendants waited almost three weeks to turn over the report thereby denying Mr. Gonzales the opportunity to petition the Court with a blood draw to show that Mr. Gonzales had not consumed alcohol. At all times relevant, Defendants SCRAM and AMS, acting under the color of authority, violated Mr. Gonzales' first amendment right to petition the Court. The Defendants are state actors, and therefore are liable for the violations.

376.   Mr. Gonzales believes, and thereon alleges that SCRAM, AMS, the State of California, and the Superior Court have entered into a written contract on or around June of 2010. And in the signed contract, exist a written policy that does permit SCRAM and AMS to turn over delayed reports, and in turn are provided immunity from prosecution for criminal violations.

377.   Mr. Gonzales further believes, and thereon alleges that SCRAM and AMS have an established pattern and practice of delaying in turning over any and all violations reports weeks, or months later so that Defendants SCRAM and AMS can paint a picture of themselves in the eyes of the State of California that SCRAM and AMS are right, the SCRAM wearer consumed alcohol, and that the SCRAM customer is guilty due to any window of opportunity of getting blood drawn is virtually long gone.

378.   On August 3rd, 2017, the Court held a hearing in San Diego Superior Court to determine if Mr. Gonzales consumed alcohol, and whether or not if he was in violation of his bail bond release. At that hearing, Defendant SCRAM sent the very same case manager that Mr. Gonzales complained to, Mr. Pedro Estrada to testify as to the report and graph. Acting under the color of authority, the case manager Mr. Estrada testified for the State and Superior Court due to the fact the again, as a part of the written contract between the parties, SCRAM must send a company employee to testify at the violation hearings.

379.   Mr. Gonzales believes, and thereon alleges that SCRAM and AMS conspired together to generate a false report against him after complaining about the high end exuberant fees imposed by SCRAM and AMS. Defendant SCRAM had enough of Mr. Gonzales. Therefore, SCRAM and AMS decided to frame Mr. Gonzales for a violation, and remove him from the SCRAM program. At no time could Mr. Gonzales continue to afford the SCRAM program. Mr. Gonzales fail back on payments, and Defendants had enough. Mr. Gonzales asked for a financial reduction sheet, and Mr. Estrada stated; "it doesn't exist."

380.   At all times relevant, Defendants SCRAM and AMS, acting under the color of authority, used their government powers to wield their position by using strong arm tactics to collect monies owed to SCRAM and AMS. Defendant AMS is formally responsible for all acts committed by SCRAM. Defendants SCRAM and AMS knew that Mr. Gonzales could not afford the high fees, was clearly entitled to a fee reduction, and denied Mr. Gonzales his due process rights that are guaranteed by 14th Amendment to the United States Constitution. Mr. Gonzales, nor any other Plaintiff, and members of the class cannot be treated differently for their inability to pay. Defendants SCRAM and AMS are thereby state actors acting under color of law, and denied the rights of the Plaintiff, and members of the class.

381.   Additionally, SCRAM and AMS have a written contract amongst themselves. Defendant AMS is the manufacture of the SCRAM Device, SCRAM is the distributer. By SCRAM buying or leasing the SCRAM Device, AMS then promises and guarantees SCRAM advertising on AMS's website that is and was created in Littleton, Colorado. Additionally, SCRAM pays thousands of dollars each month, and remits payment to AMS by wire transfer, by sending a check in the United State mail, or by bank-to-bank transfer. Defendants SCRAM and AMS are using interstate commerce to make a financial profit that all goes back to AMS at the end of the day.

382.   Unless and until the Defendants SCRAM and AMS are restrained by an order of this Court, Defendants, acting through their officers, servants, agents and employees, will continue to enforce these violations and continue to delay reports that ultimately put a person's life and freedom in the hands of two notoriously corrupt corporations, SCRAM and AMS. Unless and until this Court declares the policies and procedures of SCRAM and AMS are unconstitutional, the Defendants, acting through its officers, servants, agents and employees, will enforce the said civil rights violations. All of the acts of the Defendants, its officers, agents, as alleged herein, were done or are threatened to be done under color of state law.

383.   The Defendants policies and procedures, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff free speech rights allowed to others in similar situations and other protections of state and federal law. The said Defendants to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Angel Gonzales.

384.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Angel Gonzales has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

385.   In addition to compensatory, economic, consequential and special damages, Plaintiff Angel Gonzales, and members of the is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**17.   *Christina Bohnstedt v. Midwest Monitoring and Surveillance, Inc., and Alcohol Monitoring Systems, Inc.***

386.   On January 10, 2016, Ms. Bohnstedt was driving in the State of Minnesota and was later pulled over by local law enforcement for suspicion of a DUI offense. After Ms. Bohnstedt was ordered to get out of her vehicle, a police officer instructed Ms. Bohnstedt to perform standard field tests to determine if she was under the influence of alcohol.

387.   After the field tests were performed on Ms. Bohnstedt, the officer determined that Ms. Bohnstedt was under the influence of alcohol and the officer placed Ms. Bohnstedt in custody for the alleged offense.

388.   Ms. Bohnstedt was then taken to a local police station where she was released. Ms. Bohnstedt and her counsel later appeared in the Superior Court of the State of Minnesota. Ms. Bohnstedt was then ordered by the Court to enroll in the SCRAM program and wear the SCRAM Device as a condition of her release. Ms. Bohnstedt later enrolled into SCRAM monitoring with Midwest Monitoring and Surveillance, Inc., ("MMS").

389.   While out on release, Ms. Bohnstedt complied with all of the terms and conditions of her bond, as well as with her SCRAM conditions with MMS, and made all of her payments on time. At the time, Ms. Bohnstedt was employed full time.

390.   While attending the outpatient program, Ms. Bohnstedt was required to meet periodically with her probation officer. Ms. Bohnstedt was given several

drug and alcohol tests by her probation officer and passed all of them. On January 10, 2017, Ms. Bohnstedt had just met with her probation officer and they went over the conditions of probation and other requirements of probation.

391.   During her meeting with the probation officer, Ms. Bohnstedt learned from her probation officer that MMS and AMS issued the report and that Ms. Bohnstedt was in violation of her SCRAM conditions. Ms. Bohnstedt was set to terminate from the SCRAM MMS program and live a nice quite life.

392.   However, those dreams came to a screeching halt. For the very first time after Ms. Bohnstedt got her life together, attended meetings, and eliminated alcohol from her life all together, Ms. Bohnstedt learned that MMS and AMS had generated a report indicating that Ms. Bohnstedt consumed alcohol.

393.   Coincidentally, that same day, Ms. Bohnstedt was scheduled to have the SCRAM Device removed. Defendants MMS and AMS indicated in their SCRAM report that Ms. Bohnstedt tampered with the SCRAM Device and consumed alcohol.

394.   This is an impossibility due to the facts that both MMS and AMS advertise that when a SCRAM customer attempts to defeat the technology by placing an object over or between the sensor (IR) system of the SCRAM Device, then the SCRAM Device is unable to reach out an absorb a sweat sample necessary to determine if the customer consumed alcohol.

395.   Based on the statements and omissions by the Defendants, it is clear that there is no way possible that the SCRAM Device can do both. The report was so poor, that not even an AMS or MMS employee couldn't piece together their reports. In fact, the AMS employee informed the Court and prosecutor that he "was just not sure what took place."

396.   As a direct result of the SCRAM and AMS report that was sent to the Court, the trial Court then issued a bench warrant for Ms. Bohnstedt' arrest. Due to the fact that Ms. Bohnstedt had done nothing wrong, and did not consume any

form of alcohol, Ms. Bohnstedt turned herself in and was held in jail for five days and was then released. While sitting in jail, Defendants MMS and AMS caused Ms. Bohnstedt to lose her job, home, and other personal property. Several days after turning herself in, Ms. Bohnstedt was released on her own recognizance.

397.   Ms. Bohnstedt was later given a court date to appear in Court. Once in Court, an AMS employee informed the prosecutor that the report "didn't make sense," causing the prosecutor to drop the consumption allegation, and pursue only the tamper allegation. But as stated before, when a SCRAM wearer uploads daily SCRAM readings with AMS, then in turn the readings are then transmitted from the SCRAM Device, to a AMS' central facility in Littleton, Colorado where a minimum wage employee with no training experience, no college certification, purportedly reads the alleged consumption report and issues a determination whether or not the SCRAM wearer consumed alcohol. Based on confidential information obtained by a reliable source, a former AMS employee, informed the Plaintiffs that AMS gives the power and authority to this non-certified, minimum wage employee is allowed to "pick and choose" which or what type of violation to issue.

398.   In some instances, the AMS employee picks both that the SCRAM wearer tampered with the SCRAM Device by blocking the infrared system inside the Device, and consumed alcohol. But realistically speaking, the SCRAM Device cannot do both. If the SCRAM wearer is tampering with the SCRAM Device, then the SCRAM Device is unable to reach out and obtain sweat levels to send back to AMS' facility in Colorado.

399.   Once Ms. Bohnstedt was released, that same day, Ms. Bohnstedt wanted to prove her innocence. After all, Ms. Bohnstedt turned herself in, and was noted in court transcripts. Ms. Bohnstedt contacted MMS and demanded copies of all alleged reports. However, MMS did inform Ms. Bohnstedt that she had missed

1    payments that were due to be paid to MMS for outstanding balances, which by all

2    accounts was during the time Ms. Bohnstedt was incarcerated by MMS and AMS.

3        400.    On or about February 15, 2017, Ms. Bohnstedt appeared in Court with

4    her attorney. For the very first time, Ms. Bohnstedt was able to review the report

5    that her attorney showed Ms. Bohnstedt. And her attorney informed Ms. Bohnstedt

6    that her attorney just got the report an hour before the hearing in Court concerning

7    Ms. Bohnstedt. Despite several requests to MMS and AMS, the Defendants failed

8    and refused to turn over the SCRAM reports in a timely manner.

9        401.    At all times relevant, MMS and AMS were acting under the color of

10   authority.

11       402.    Additionally, MMS and AMS have a written contract amongst

12   themselves. Defendant AMS is the manufacture of the SCRAM Device, MMS is

13   the distributer. By MMS buying or leasing the SCRAM Device, AMS then

14   promises and guarantees SCRAM advertising on AMS's website that is and was

15   created in Littleton, Colorado.

16       403.    Additionally, MMS pays thousands of dollars each month, and remits

17   payment to AMS by wire transfer, by sending a check in the United State mail, or

18   by bank-to-bank transfer. Defendants MMS and AMS are using interstate financial

19   commerce to make a financial profit that all goes back to AMS at the end of the

20   day.

21       404.    Unless and until the Defendants MMS and AMS are restrained by an

22   order of this Court, Defendants, acting through their officers, servants, agents and

23   employees, will continue to enforce these violations and continue to delay reports

24   that ultimately put a person's life and freedom in the hands of two notoriously

25   corrupt corporations, MMS and AMS. Unless and until this Court declares the

26   policies and procedures of MMS and AMS are unconstitutional, the Defendants,

27   acting through its officers, servants, agents and employees, will enforce the said

28   civil rights violations. All of the acts of the Defendants, its officers, agents, as

alleged herein, were done or are threatened to be done under color of state law.

404.   The Defendants policies and procedures, on its face and as applied, or threatened to be applied, violates the Right to Petition and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and similar guarantees in the Constitution by denying Plaintiff Christina Bohnstedt free speech rights allowed to others in similar situations and other protections of state and federal law. The said Defendants to this claim at all times relevant hereto were acting pursuant to a custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff Christina Bohnstedt.

405.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, the Plaintiff Christina Bohnstedt has incurred special damages and other special damages related expenses, in amounts to be established at trial. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

406.   In addition to compensatory, economic, consequential and special damages, Plaintiff Christina Bohnstedt, and members of the is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

## CLASS DEFINTITIONS AND RULE 23 PREREQUISITES

Plaintiffs bring this action on their own behalf, and also on behalf of the various classes of all other persons similarly situated, pursuant to Federal Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity:** In accordance with F.R.Civ. P. Rule 23(a), upon information and belief, the Class comprises of thousands of customers throughout the United States, and are so numerous that joinder of all class members of the Class is also impracticable. While the exact number of Class members are presently unknown and can only be ascertained through discovery.

Plaintiffs believe there are thousands of Class members Nationwide based upon the fact that Defendants sell the Scram Devices in all 50 states of the United States, including the territories of Guam, and Puerto Rico, the United Kingdom, Canada, Australia, and New Zealand. There are over 50 persons from each of the Defendants' offices being monitored at any given time, and there is constant change and turnover in who receives a false positive report. The Plaintiffs are informed and believe, and thereon allege, that the number of persons in each of these classes is at least in the hundreds.

**Ascertainability:**  Class members can be easily identified through the Defendants' records, and each of their computer systems or by other means. The identity of all AMS customers is stored in AMS' Monitoring Web Portal. Their identities are also kept on file no matter which third party alcohol provider the customer has service with.

## CLASS ACTION ALLEGATIONS

Plaintiffs bring this action pursuant to the Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and a class defined as follows:

**Nationwide Class:**   All individuals nationwide who, from four years prior to the filing of this Complaint through to date of certification purchased, leased and/or rented from each of the Defendants for their ankle monitoring service.

**Nationwide Class:**   All individuals nationwide who, from four years prior to the filing of this Complaint through to date of certification, had a violation report filed by each of the Defendants.

**Nationwide Class:**   All individuals nationwide who, from four years prior to the filing of this Complaint through to date of certification, had their federal civil rights violated by each of the Defendants.

**Nationwide Class:**   All individuals nationwide who, from four years prior to the filing of this Complaint through to date of certification, paid money to the Defendants for their ankle monitoring service, including but not limited to, set-up fees, ethernet cable fees, upload fees, and battery charge fees.

## COMMON ISSUES OF FACT AND LAW

**In accordance with F.R. Civ. P. Rule 23(a),** there are questions of law and fact common to the class. The common questions of fact include, but are not limited to the following:

a)       Whether the Defendants' policies and practices of failing to turn over their Scram reports in a timely manner violates the federal First Amendment of the Right to Petition;

b)       Whether the Defendants' policies and practices of failing to turn over their Scram reports in a timely manner violates the federal Sixth Amendment of the right to call witnesses in criminal proceedings;

c)       Whether the Defendants' policies and practices of collecting financial monies from their customers violates the federal Fourteenth Amendment of the

1  Due Process Clause of the 14th Amendment;

2      d)      Whether the Defendants' are acting under the color of authority in

3  their business practices;

4      e)      Whether the Defendants' policies and practices of collecting financial

5  monies from their customers violates the federal Fourteenth Amendment of the

6  Due Process Clause of the 14th Amendment;

7      f)      Whether the Defendants' conspired with one another to violates the

8  Constitutional rights of the Plaintiffs and all others similarly situated;

9      g)      Whether the Defendants engaged in the alleged conduct knowingly,

10  intentionally, recklessly, or negligently; and;

11      h)      Whether equitable remedies, injunctive relief, compensatory damages,

12  and punitive damages for the Class are warranted;

13      407.   Plaintiffs' claims are typical of the claims of the Class.

14      408.   Plaintiffs' will fairly and adequately represent and protect the interests

15  of the Class.

16      409.   Plaintiffs have retained counsel competent and experienced in

17  complex class actions and employment discrimination litigation.

18      410.   Class certification is appropriate pursuant to **Federal Rule of Civil**

19  **Procedure 23(b)(2)** because Defendants has acted and/or refused to act on grounds

20  generally applicable to the Class, making appropriate declaratory and injunctive

21  relief with respect to Plaintiffs and the Class as a whole.  The Class Members are

22  entitled to injunctive relief to end the Defendants constitutional, common, uniform,

23  unfair, and discriminatory policies and practices.

24      411.   Class certification is also appropriate pursuant to Federal Rule of Civil

25  Procedure 23(b)(3) because common questions of fact and law predominate over

26  any questions affecting only individual members of the Class, and because a class

27  action is superior to other available methods for the fair and efficient adjudication

28  of this litigation.  The Class Members have been damaged and are also entitled to

recovery as a result of Defendants constitutional, despicable, common, unfair, and discriminatory policies and practices. Defendants have computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members relatively simple. The propriety and amount of punitive damages are based on Defendants conduct, making these issues common to the Class.

412.   **Typicality: In accordance with F.R. Civ. P. Rule 23(a),** the claims of the representative Plaintiffs are typical of each class. Plaintiffs were subjected to jail time, loss of liberty and loss of thousands of dollars in attorney fees, and lost income, based on the Constitutional violations of the Defendants.

413.   Thus, the Plaintiffs have the same interests, and have suffered the same type of damages as the class members. Named Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members. Each class member suffered actual damages as a result of the Defendants' Constitutional violations. The actual damages suffered by Plaintiffs are similar in type and amount to the actual damages suffered by each class member.

414.   **In accordance with F.R. Civ. P. Rule 23(a),** the Named Plaintiffs will fairly and adequately protect the interests of the class. The interests of the Named Plaintiffs are consistent with and not antagonistic to the interests of the class.

415.   **Maintenance and Superiority:   In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A),** prosecutions of separate actions by individual members of the class would create a risk that inconsistent or varying adjudication with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

416.   **In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B),** prosecutions of Separate actions by individual members of the class would create a risk of Adjudications with respect to individual members of the class that would, as a practical matter, substantially impair or impede the interests of the other members

-104-

1   of the class to protect their interests.

2      417.   **In accordance with Fed.R.Civ.P. Rule 23(b)(2)**, Plaintiffs are

3   informed and believe, and thereon allege that Defendants have acted on grounds

4   fully generally applicable to the class.

5      418.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law

6   or fact common to the members of the class predominate over any questions

7   affecting only individual members, and this class action is superior to other

8   available methods for the fair and efficient adjudication of the controversy between

9   the parties. The interests of class members in individually controlling the

10   prosecution of a separate action is low in that most class members would be unable

11   to individually prosecute any action at all. The amounts at stake for individuals are

12   such that separate suits would be impracticable in that most members of the class

13   will not be able to find counsel to represent them. It is desirable to concentrate all

14   litigation in one forum because all of the claims arise in the same location. It will

15   promote judicial efficiency to resolve the several common questions of law and

16   fact in one forum rather than in multiple courts. Because the discrimination alleged

17   herein is systemic, it is particularly well suited to resolution on a class basis, as the

18   critical questions in the case may be answered on a class, wide basis.

19      419.   Plaintiffs do not know the identities of the class members. The

20   Plaintiffs are informed and believe, and thereon allege, that the identities of the

21   class members are ascertainable from SCRAM records, in particular the SCRAM

22   computer systems used to track and identify SCRAM clients. Plaintiffs are hereby

23   informed and believes, and thereon allege, that the SCRAM computer records

24   reflect the identities, including addresses and telephone numbers, of the persons

25   who have been using SCRAM Device.

26      420.   Plaintiffs do not know of any difficulty that will be encountered in the

27   management of this litigation that would preclude its maintenance as a class action.

28   The class action is superior to any other available means to resolve the issues

raised on behalf of the classes. The class action will be manageable because so many different records systems exist from which to ascertain the members of the class and to ascertain some of the proof relevant to Plaintiffs claims. Liability can be determined on a class-wide basis, based on class-wide evidence because the Plaintiffs complain of systemic and widespread defective products and equipment.

421. **In accordance with Fed.R.Civ.P. Rule 23(b)(3),** class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that SCRAM computer records contain a last known address for class members. Plaintiffs' contemplate that individual notice be given to class members at such last known address by first class mail. Plaintiffs contemplate that the notice informs class members of the following:

A.    The pendency of this action, and the issues common to the class;

B.    The nature of the action;

C.    Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.    Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.    Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.  Plaintiffs restates and incorporates by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

# FIRST CLAIM FOR RELIEF

## (Violation of Federal Civil Rights Act of 1964, 42 U.S.C. § 1983 *et seq.*)

## (On Behalf of Plaintiffs and the Class v. All Defendants [2]

422.    Plaintiffs incorporate the preceding paragraphs as alleged above.

423.    The Defendants acting under color of authority, when they violated the Plaintiffs, and the Class' well established rights guaranteed by the First, Sixth, and Fourteenth Amendments to the United States Constitution, the Civil Rights act of 1964, and the laws of the United States, by the acts alleged above.

424.    42 U.S.C. § 1983 provides in part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

425.    Defendants and each of them, who was at all times, acting under color of authority, deprived the Plaintiffs, and the Class of their rights, privileges, and immunities secured by the Constitution and laws of the United States including the First, Sixth, and Fourteenth Amendments by:

a.    delaying in turning over exculpatory evidence that the Defendants, and each of them, knew and had reason to know, would be favorable to the Plaintiffs innocence;

b.    Interfering with the Plaintiffs right to calls witnesses on their behalf and obtain blood tests in a timely manner guaranteed by the Sixth, and Fourteenth Amendments;

c.    The Defendants, and each of them, using dirty, unlawful, and illegal

---

[2]  Without each Plaintiff having to list out each Defendant for each of the causes of actions, Plaintiffs will limit the number of pages by listing each cause of action as all Plaintiffs v. all Defendants, which will not only shorten the complaint, but make things easier for the Court.

1  means of collecting monies from the Plaintiffs, and the Class;

2  426..  As a direct and proximate result of the aforementioned acts of the said

3  Defendants, Plaintiffs was, and still is, injured as set forth above, and is entitled to

4  compensatory and punitive damages according to proof. In addition, Plaintiffs the

5  Plaintiffs are entitled to an award of punitive damages.

6  **SECOND CLAIM FOR RELIEF**

7  **(Violation of Federal First Amendment, 42 U.S.C. § 1983 _et seq._)**

8  **(On Behalf of Plaintiffs and the Class v. All Defendants** [3]

9  427.  Plaintiffs incorporate the preceding paragraphs as alleged above.

10  428.  This claim is brought by Plaintiffs on behalf of themselves and the

11  Class they seek to represent.  Plaintiffs have been charged with alleged Scram

12  violations in a criminal Court of law that effects the criminal cases, conditions of

13  their bail bond, as well as their conditions of probation.

14  429.  The Defendants, and each of them, acting under the color of authority,

15  knowingly and intentionally fail to turn over alleged Scram violations reports in a

16  timely manner that is mandated by State and Federal law. The Defendants

17  intentional acts of failing to turn over exculpatory evidence, denies the Plaintiffs,

18  and the Class enough notice to properly defend themselves against any alleged

19  Scram report by allowing Plaintiffs, and the Class, to seek blood tests that would

20  refute the Defendants allegations that they consumed alcohol. Defendants, and

21  each of them, delay by weeks, or even months in turning over alleged consumption

22  reports to the Plaintiffs, the Class, and their attorneys.

23  430.  Therefore, the Defendants conduct is unconstitutional on its own face

24  and in clear violation of the federal First Amendment right for the Plaintiffs and

25

26  [3]  Each of the Plaintiffs reiterate that none of the Plaintiffs are challenging their alleged SCRAM violation. Each Plaintiff only gives an introduction so the Court has an understanding of how the Plaintiff

27  came into contact with SCRAM. Accordingly, Plaintiffs are only challenging the business policies and procedures of how the Defendants delay, deny, and eventually turn over alleged violation reports. None of

28  the Plaintiffs are seeking damages from any SCRAM conviction either.

the Class to petition the Courts to seek exoneration of the false allegations.

431.   At all times relevant, the Defendants, and each of them, were acting under the color of authority when they denied the Plaintiffs and the Class of their Constitutional rights.

432.   Defendants' true purpose for delaying in turning over their reports to the Plaintiffs, and the Class, is an elaborate attempt to show that the Plaintiff, the Class, and others similarly situated, have consumed alcohol, when in fact they have not. Defendants intentionally delay in turning over their reports to bolster their products to government agencies to establish government contracts.

433.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal and punitive damages.

## **THIRD CLAIM FOR RELIEF**

### **(Violation of Federal Sixth Amendment, 42 U.S.C. § 1983 *et seq.*)**

### **(On Behalf of Plaintiffs and the Class v. All Defendants**

434.   Plaintiffs incorporate the preceding paragraphs as alleged above.

435.   The Defendants acting under color of authority, when they violated the Plaintiffs, and the Class' well established rights guaranteed by the First, Sixth, and Fourteenth Amendments to the United States Constitution, the Civil Rights act of 1964, and the laws of the United States, by the acts alleged above.

436.   The Sixth Amendment States in relevant part:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his (or her) defense.

-109-

437.   By the Defendants policies and practices of failing to turn over their Scram reports in a timely fashion does violate the Sixth Amendment to the United States Constitution. As a result of this misconduct, the Defendants, and each of them acted under color of law, deny the Plaintiffs, and the Class, their right to call witnesses on their behalf, and to be able to cross examine witnesses.

438.   At all times relevant, the Defendants, and each of them, acting under the color of authority, intentionally interfered with the Plaintiffs' rights to call any and all witnesses, and cross examine any defense witnesses. Defendants recklessly, intentionally, and in complete disregard for the rights of the Plaintiffs, interfered with those Constitutional rights.

439.   As a direct and proximate result of Defendants' violation of the Sixth Amendment, Plaintiffs, and the Class, have suffered, and continue to suffer severe irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal and punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Violation of Federal Fourteenth Amendment, 42 U.S.C. § 1983 *et seq*.)

### (On Behalf of Plaintiffs and the Class v. All Defendants

440.   Plaintiffs incorporate the preceding paragraphs as alleged above.

441.   The Defendants acted under color of authority, when they violated the Plaintiffs, and the Class' well established rights guaranteed by the First, Sixth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1964, and the laws of the United States, by the acts alleged above.

442.   The Fourteenth Amendment to the United States Constitution, is enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

443.   The Due Process Clause prohibits the Defendants acting under the color of authority from subjecting individuals to processes and penalties that fail to

-110-

comport with principles of due process and fundamental fairness.

444.   The United States Supreme Court has repeatedly held that punishing a person solely for his or her inability to pay, rather than willful refusal to pay, or make bona fide efforts to acquire the resources to pay, violates principles of due process and fundamental fairness.

445.   Punishing an individual solely for his or her inability to pay, violates principles of due process and fundamental fairness.

446.   At all times relevant, the Defendants, and each of them, acting under the color of authority, intentionally interfered with the Plaintiffs, and the Class' right to pay lower amounts of monthly service costs to the Defendants, and each of them for their alcohol monitoring services.

447.   As a direct and proximate result of Defendants' actions, Defendants, and each of them, are in violation of the Fourteenth Amendment. Plaintiffs, and the Class, have suffered, and continue to suffer severe irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal and punitive damages.

# FIFTH CLAIM FOR RELIEF

## (Permanent and Injunctive Relief)

## (On Behalf of Plaintiffs and the Class v. All Defendants

448.   Plaintiffs incorporate the preceding paragraphs as alleged above.

449.   The Defendants, and each of them interfered with the rights of the Plaintiffs to equal protection of the law under, and due process.

450.    The aforementioned acts of the Defendants, and each of them, have proximately caused the Injunctive Relief Class Representatives and Class to be denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, programs or activities receiving financial funding and assistance from each of the various states in the United States who have entered into a written contract with each of the Defendants.

451.   The Injunctive Relief Class Representatives and Class are currently subject to, and will continue to be subject to, absent the intervention of this court, the unlawful treatment alleged herein, and therefore, seek injunctive relief under the foregoing Constitutional provisions and statutes on behalf of themselves and the class of similarly situated individuals.

452.   Defendants wrongful conduct as alleged, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiff and all similarly situated individuals.

453.   Plaintiff and all other similarly situated individuals have no adequate remedy at law for their injuries. The Defendants, and each of them are unrestrained in their ability to waste hard earned taxpayer money, and can escape liability by using the great governmental power and resources entrusted to them by the people, citizens, and tax payers of each state. If left unfettered, Defendants, and each of them, can systematically and continuously violate the Constitutional rights of individuals, including Plaintiff.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

454.   There are absolutely no countervailing benefits to violating the well-established Constitutional rights of individuals, and as long as Defendants are allowed to continue to investigate, incarcerate, detain, monitor, assault, handcuff people, use threats of arrest and detention to collect money, and brutally assaulting persons in their custody for their own personal greed and selfish ambitions, the public, including Plaintiffs, will continue to be irreparably harmed.

455.   Therefore, this Court should refer this case to the United States Attorney's office to investigate the Defendants, and each of them for civil rights violations, conspiracy to violate civil rights violations, Racketeering, Conspiracy to RICO, Antitrust Violations, Security Exchange Violations, and IRS Fraud;

456.   Therefore, this Court should order the Defendants, and each of them to lower or eliminate all "set-up" fees initiated by each of the SCRAM Defendants;

457.   Therefore, this Court should order the Defendants, and each of them to maintenance and collaborate each and every SCRAM ankle monitor weekly, or monthly, and order the Defendants, and each of them to log in the model/serial number, the date, time, case manager name, client name, and to keep these records on file for at least five years when this is done;

458.   Therefore, this Court should order the Defendants, and each of them to generate a financial reduction form to be provided, and signed by every SCRAM client once a client enrolls in the SCRAM monitoring programs. And that each client and case manager sign the form acknowledging the client being provided with the financial reduction sheet;

459.   Therefore, this Court should order the Defendants, and each of them to send notice of this lawsuit to every company, government agency, probation, parole, the Governor of their state, and notice to all current SCRAM clients;

460.   Therefore, this Court should order the Defendants, and each of them to immediately stop threating past, present, and future SCRAM clients with arrest, detention, immigration arrests, collections, and warrants for failure to pay the Defendants for their weekly, bi-weekly, monthly, the set-up fees, and any and all fees due to the Defendants in general;

461.   Therefore, this Court should order the Secretary of States to suspend all business licenses until the Plaintiffs injunctive relief is granted;

462.   Therefore, this Court should order all government agencies to cease and desist in providing money to the Defendants until changes have been made, and the Defendants have shown compliance to the Court;

463.   Therefore, this Court should order the Defendants, and each of them to stopping harassing all past and present SCRAM clients by calling them late at night. Such as no calls after 5:00pm, and order Defendants employees to stop going to SCRAM clients place of employment, or home to collect outstanding balances;

464.   Therefore, this Court should order the Defendants, and each of them to stop *engaging in illegal ex parte communications with all Judges*, Superior Court staff, trial Courts, Magistrate Courts, and any other judicial Courts by sending reports, letters, making telephone calls to Court staff, Judges, and any other members of the Court where as the violation report, letter, or phone call would be deemed an illegal *ex parte* communication;

465.   Therefore, this Court should order some of the Defendants who are deemed private probation and parole officers to stop arresting people who have missed a payment, or allegedly consumed alcohol;

466.   Therefore, this Court should order some, if not all of the Defendants to stop making campaign contributions to elected City, County, State, and also municipal judges;

467.   Furthermore, the Court should order teach of the Defendants, (by and through its agents, officers and employees of AMS) to require their agents, officers and employees to undergo additional and mandatory training and testing to ensure their agents, officers and employees understand and comply with their legal duties with respect to the proper procedures of turning over exculpatory evidence, providing copies of reports to SCRAM clients, and defense attorneys. And to eliminate all policies and procedures of waiting weeks, or months to turn over all alleged SCRAM reports, and that these procedures, policies and conditions are complied with under State and Federal law.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, and on behalf of the Class, pray for an Order as follows:

     A.    Certification of the case as a class action on behalf of the proposed Class;

     B.    Designating Plaintiffs as representatives of the Class, and their undersigned counsel as Class Counsel;

     C.    A declaratory judgment that the principles complained of herein are unlawful and violate 42 U.S.C. § 1983, the First, Sixth, and Fourteenth Amendments to the United States Constitution;

     D.    Entering judgment in favor of Plaintiffs and the Class, against the Defendants, jointly and severally;

     E.    Ordering disgorgement of the money that Plaintiffs and the Class paid to the Defendants alcohol monitoring service, and awarding the disgorged money as restitution damages to Plaintiffs and the Class, and any other equitable relief that may be appropriate, and interest thereon, as allowed or required by law;

     F.    A preliminary and permanent injunction against Defendants, and each of them, and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against the Plaintiffs or the Class because of their gender, financial status, or participation in this lawsuit;

     G.    An order requiring Defendants to pay restitution of all amounts owed to the Plaintiffs by the Defendants;

     H.    This Court should order the United States Attorney's office to investigate the Defendants for civil rights violations, conspiracy to violate civil rights violations, Racketeering, conspiracy to RICO, Antitrust violations, security exchange violations, and IRS Fraud;

1    I.    This Court should order the Defendants, and each of them to lower all,

2    or eliminate all "set-up" fees initiated by each of the SCRAM Defendants;

3    J.    This Court should order the Defendants, and each of them to

4    maintenance and collaborate each and every SCRAM ankle monitor weekly, or

5    monthly, and order the Defendants, and each of them to log in the model/serial

6    number, the date, time, case manager name, client name, and to keep these records

7    on file for at least five years;

8    K.    This Court should order the Defendants, and each of them to generate

9    a financial reduction form to be provided, and signed by every SCRAM client once

10   a client enrolls in the SCRAM monitoring programs. And that each client and case

11   manager sign the form acknowledging the client being provided with the financial

12   reduction sheet;

13   L.    This Court should order the Defendants, and each of them to send

14   notice of this lawsuit to every company, government agency, probation, parole, the

15   Governor of their state, and notice to all current SCRAM clients;

16   M.    This Court should order the Defendants, and each of them, to

17   immediately stop threating past, present, and future SCRAM clients with arrest,

18   detention, immigration arrests, collections, and warrants for failure to pay the

19   Defendants for their weekly, bi-weekly, monthly, the set-up fees, and any and all

20   fees due to the Defendants in general;

21   N.    This Court should order the Secretary of States to suspend all business

22   licenses until the Plaintiffs injunctive relief is granted;

23   O.    This Court should order all government agencies to cease and desist in

24   providing money to the Defendants until changes have been made, and the

25   Defendants have shown compliance to the Court;

26

27

28

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

P.      This Court should order the Defendants, and each of them to stopping harassing all past and present SCRAM clients by calling them late at night. Such as no calls after 5:00pm, and order Defendants employees to stop going to SCRAM clients place of employment, or home to collect outstanding balances;

Q.      This Court should order the Defendants, and each of them to stop *engaging in illegal ex parte communications with all Judges*, Superior Court staff, trial Courts, Magistrate Courts, and any other judicial Courts by sending reports, letters, making telephone calls to Court staff, Judges, and any other members of the Court where as the violation report, letter, or phone call would be deemed an illegal *ex parte* communication;

R.      This Court should order some of the Defendants who are deemed private probation and parole officers to stop arresting people who have missed a payment, or allegedly consumed alcohol;

S.      This Court should order some, if not all of the Defendants to stop making campaign contributions to elected City, County, State, and also municipal judges;

T.      Furthermore, the Court should order teach of the Defendants, (by and through its agents, officers and employees of AMS) to require their agents, officers and employees to undergo additional and mandatory training and testing to ensure their agents, officers and employees understand and comply with their legal duties with respect to the proper procedures of turning over exculpatory evidence, providing copies of reports to SCRAM clients, and defense attorneys. And to eliminate all policies and procedures of waiting weeks, or months to turn over all alleged SCRAM reports, and that these procedures, policies and conditions are complied with under State and Federal law.

1    U.    For general and special damages in an amount according to proof;

2    V.    For an award of reasonable attorney fees pursuant to 42 U.S.C. §

3    1981A;

4    W.    For an award of punitive damages against the Defendants pursuant to

5    42 U.S.C. § 1981A(b)(1);

6    X.    For costs of suit pursuant to Fed.R.Civ.P. 54(d), and 28 U.S.C. §

7    1920;

8    Y.    For an order directing the Defendants to pay restitution;

9

10   Z.    An award to Plaintiffs and the Class of such other and further relief as

11   this Court deems just and proper.

12

13   Dated:    September 21, 2017    **WILLAIM A. LeFAIVER, CO., LPA.**

14

15               By:  S/ William A. LeFaiver, Esq._____

16               WILLIAM A. LeFAIVER, Attorney at Law

17               **THE ORR LAW FIRM, L.L.C.**

18

19               By:  /S/ Rhidian Orr, Esq._____

20               RHIDIAN ORR, Attorney at Law

21               NATE JOHNSON, Attorney at Law

22               CONOR HAGERTY, Attorney at Law
     RICK HERNANDEZ, Attorney at Law

23   *Attorneys for Plaintiffs and the Putative Class*

24

25

26

27

28

-119-
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
PURSUANT TO 42 U.S.C. § 1983

## <u>**JURY TRIAL DEMANDED**</u>

Plaintiffs are entitled to, and demand, a trial by jury pursuant to the Seventh Amendment to the United States Constitution.

Dated:      September 21, 2017      **WILLAIM A. LeFAIVER, CO., LPA.**

By:  S/ William A. LeFaiver, Esq._____

WILLIAM A. LeFAIVER, Attorney at Law

**THE ORR LAW FIRM, L.L.C.**

By:  /S/ Rhidian Orr, Esq._____

RHIDIAN ORR, Attorney at Law
NATE JOHNSON, Attorney at Law
CONOR HAGERTY, Attorney at Law
RICK HERNANDEZ, Attorney at Law

*Attorneys for Plaintiffs and the Putative Class*